Kalima **JENKINS, et al.**

v.

**STATE OF MISSOURI, Kansas City, Missouri School District, and Department of Housing and Urban Development.**

**No. 77–0420–CV–W–4.**

United States District Court,
W.D. Missouri, W.D.

Sept. 17, 1984.

---

Arthur A. Benson, II, Benson & McKay, Kansas City, Mo., Deborah Fins, NAACP Legal Defense & Education Fund, New York City, for plaintiffs.

James Borthwick, Shirley Keeler, Blackwell, Sanders, Matheny, Weary & Lombardi, Kansas City, Mo., for defendant Kansas City Missouri School Dist.

Larry R. Marshall, Sp. Asst. Atty. Gen., Columbia, Mo., for defendant State of Mo.

Marta Berkley, Merril Hirsh, Civ. Div., Washington, D.C., and Richard C. Stearns, Dept. of HUD, Washington, D.C., for defendant Dept. of HUD.

## ORDER

RUSSELL G. CLARK, Chief Judge.

Originally, plaintiffs and the KCMSD filed this action jointly alleging various federal and state agencies and surrounding school district officials caused or contributed to cause the racial segregation existing in the metropolitan schools. In 1978 when the KCMSD was realigned as a defendant, plaintiffs made similar allegations against it, although there has been, during the course of this litigation, a "friendly adversary" relationship between them. (*See,*

*e.g.*, stipulations of fact, filed February 21, 1984).

The KCMSD cross-claimed only against the state for its failure to eliminate the vestiges of its prior dual school system. For additional background, see this Court's orders of June 5 and July 16, 1984..

Jurisdiction is premised on 28 U.S.C. §§ 1331, 1343(3) and (4), 136, 2201 and 2202. Plaintiffs also allege claims under 42 U.S.C. §§ 1983 and 2000d and under the United States Constitution, 14th Amendment. Declaratory and injunctive relief was sought against all defendants.

After hearing the presentation of plaintiffs' evidence and before any defense, the Court dismissed the suburban school districts. Plaintiffs simply failed to show that those defendants had acted in a racially discriminatory manner that substantially caused racial segregation in another district. *Milliken v. Bradley*, 418 U.S. 717, 745, 94 S.Ct. 3112, 3127, 41 L.Ed.2d 1069 (1974). *See* order filed June 5, 1984.

HEW was also dismissed for plaintiffs' failure to prove the agency acted with racial animus or abused its discretion in the enforcement of Title VI. *See* order filed July 16, 1984. The KCMSD presented its cross-claim, Missouri and HUD defended, plaintiffs and the KCMSD rebutted, Missouri presented surrebuttal and, on the 92nd day of trial, the Court refused to hear sur-surrebuttal. Thus, on June 13, 1984, the evidence ended.

The claims addressed by this order are plaintiffs' claims against the KCMSD, the State of Missouri and HUD and the cross-claim of KCMSD against the State of Missouri. For the reasons that follow, the Court finds in favor of plaintiffs against the KCMSD and the State of Missouri; in favor of KCMSD against the State of Missouri; and against plaintiffs and in favor of HUD.

## THEORIES AND DEFENSES

Plaintiffs allege, and Missouri has admitted, it mandated racially segregated schools before 1954. It is plaintiffs' position that after 1954 Missouri failed to take affirmative steps to eliminate the vestiges of its prior dual school system. In fact, plaintiffs argue, Missouri acted to perpetuate racial segregation by enforcing restrictive covenants and other unfair housing practices, by discriminatorily relocating blacks who were displaced by highway development and urban renewal, and by supporting racially-identifiable interdistrict arrangements (e.g. vocational and special education area schools).

Against the KCMSD, plaintiffs claim district officials adopted ineffective policies to change the segregative patterns that were developed or developing. In an exculpatory allegation plaintiffs allege the KCMSD could not balance the racial population of students in its district due to impaction of minorities, white flight, housing policies of other agencies and "other factors beyond the capacity of that district to manage." (Amended complaint, May 18, 1979 ¶ 20).

Regarding HUD, plaintiffs allege the agency abrogated its affirmative duty to prevent and reduce racial segregation and instead intentionally increased segregation by failing to consider racial isolation in its site location for low income projects and locating most of the projects within the KCMSD; establishing express guidelines before 1948 requiring racial segregation and permitting such practices after that date; funding local housing agencies which did not prevent segregation in their policies or practices; and providing funds and insurance to suburban areas where access to blacks was restricted. These policies and practices, plaintiffs claim, racially impacted the KCMSD schools.

In its cross-claim against Missouri [1] the District alleges the State has not fulfilled its constitutional obligation to take action to dismantle its prior dual school system

---

**1.** The collective designation of "Missouri" or "State" is intended to include the governor, the Missouri State Board of Education and its offi-cers, and Arthur L. Mallory, the state Commissioner of Education.

and is primarily liable for the existing segregation in the KCMSD. Not only has Missouri failed to take necessary remedial measures to eliminate past segregation but the District charges the state has acted to perpetuate segregation. To the extent the Court might find the KCMSD to be internally segregated, the District alleges the State is largely responsible for such a condition and should be required to contribute financially to any remedial plan the Court might order as relief against the KCMSD. Further, the District charges the State has caused a high concentration of economically and socially disadvantaged minority students within its boundaries, a condition which increased student expenses and decreased the District's tax base. Concomitantly, the KCMSD alleges the State's actions or omissions caused the surrounding districts to be predominantly white.

For relief, therefore, the KCMSD seeks a court order requiring the State to propose and assist (financially and otherwise) in the implementation of a plan which will eradicate any vestiges of the State's past dual school system which includes the racially identifiable character of the KCMSD and the surrounding suburban districts.

Plaintiffs claim the only effective way to "protect and preserve" the constitutional rights of plaintiffs is to judicially mandate the "reassignment of students among all districts in the metropolitan area and/or to realign or reconstitute the defendant school districts," with compensatory payments made by the State to fund the reconstituted districts. (Plaintiffs' amended complaint, May 18, 1979 ¶ 25). Plaintiffs request defendants submit a plan to eliminate the racial identifiability of the KCMSD and other school districts in the metropolitan area. To facilitate adoption of such a plan, plaintiffs seek to enjoin federal agencies from funding state and local entities until the plan is submitted. Plaintiffs seek declaratory and injunctive relief against the federal defendants and statements from all defendants on their future plans to reduce and eradicate segregative conditions.

Missouri has argued in defense that it has met its affirmative duty to the extent of its statutory power and that local entities have the sole authority to effect the changes plaintiffs seek, e.g. redrawing district lines. Moreover, Missouri charges the racial isolation that exists is not vestiges but is the product of resegregation from natural demographic trends. Finally, Missouri argues the Kansas City area is typical of cities nationwide that had no dual school system; therefore the racial patterns cannot be attributed to the State's past conduct.

Procedurally, Missouri argues that plaintiffs and the KCMSD pleaded only interdistrict claims and seek only interdistrict relief, which claims were denied by this Court's order dismissing the suburban school districts. The Court disagrees. In its order of June 1, 1981, the Court addressed both the inter and intra-district claims raised by the KCMSD's cross-claim. Neither plaintiffs nor the KCMSD's pleadings are defective in this regard. In any event, and contrary to Missouri's allegations, plaintiffs moved to amend their complaint to conform to their contention interrogatories (filed October 17, 1983 Doc. No. 351). The Court deferred ruling the motion preferring to address the contentions individually as they arose during the trial. (Tr. 35). Insofar as plaintiffs' evidence (adopted by the KCMSD Tr. 17,275) stated intradistrict claims, the motion is hereby granted.

On February 21, 1984, plaintiffs and the KCMSD entered into a stipulation of fact which the Court holds is only binding between them; however, the stipulations will be controlling, unless otherwise stated by the Court, regarding the racial composition and enrollment in the District past and present, its 1955 through 1977 "desegregation" plans, its transfer policy, the Havighurst and Hazlett reports and faculty composition. The District stipulated, *inter alia*, that before 1977 it was not a unitary district or in compliance with federal regulations. (*See, also*, Tr. 24). Nor does the District contest the HEW findings of noncompliance. It does state, however, con-

trary to plaintiffs' contentions, that it did not operate with discriminatory *intent* after 1954.

HUD argues in defense that it does not select the sites for low income projects and that said projects are dispersed throughout the metropolitan area in any event. HUD also maintains it does not relocate people, but merely monitors the relocation activities of other agencies and has made adjustments where necessary. Regarding FHA, the government insists there are no vestiges of its past practices and moreover that FHA's involvement in the context of all housing transactions is *de minimis.* HUD concludes it has not abused its discretion and that plaintiff's evidence fails to show a causal link between schools and HUD's activities.

### FINDINGS OF FACT

The State admitted, and the Court judicially noticed that Missouri mandated segregated schools for black and white children before 1954. *See* Mo. Const. Art. IX, Section 1(a) (1945) (rescinded 1976) *and* §§ 163.130, 165.117 R.S.Mo. (repealed 1957). These provisions were not immediately and formally abrogated after the *Brown* decision was announced; however, the State's Attorney General issued an Opinion in 1954 declaring them unenforceable. (P. Ex. 2232). The statutes were repealed in 1957 and the constitutional provision was finally rescinded in 1976. This historical background is recounted in more detail by the courts in *Adams v. United States,* 620 F.2d 1277, 1280–81 (8th Cir.) *cert. denied,* 449 U.S. 826, 101 S.Ct. 88, 66 L.Ed.2d 29 (1980); and *United States v. Missouri,* 363 F.Supp. 739, 746–47 (E.D.Mo. 1973) *aff'd* 515 F.2d 1365 (8th Cir.) *cert. denied,* 423 U.S. 951, 96 S.Ct. 374, 46 L.Ed.2d 288 (1975).

Each school district in Missouri participated in this dual school system before it was declared unconstitutional in *Brown I.* Districts with an insufficient number of blacks to maintain the state-required separate school made interdistrict arrangements to educate those children. Undenia-

bly, some blacks moved to districts, including the KCMSD, that provided black schools. (Tr. 2043, 4557–59). As the Court previously noted, however, this movement was insignificant when compared to the total black enrollment in the KCMSD. (Tr. 1773, D.Ex. K2). Accordingly, no interdistrict constitutional violation by any suburban school district was shown. (*See* order filed June 5, 1984).

Dr. James Anderson, plaintiffs' expert historian, opined the black migration into Kansas City was from a depopulation of blacks in the surrounding three-county area moving to the city primarily for schools. In its opinion of June 5, the Court rejected Dr. Anderson's opinions as contrary to the weight of the evidence and as being without sufficient foundation. The Court finds the greatest influx of blacks came from southern and border states and that they migrated because of a host of factors.

This in-migration coupled with a high birth rate (Tr. 16,509–510) resulted in the Kansas City black population doubling from 41,574 in 1940 to 83,740 in 1960. (*Id.*)

Before 1954, access to schools was one of many reasons some blacks chose to move into the KCMSD. (Tr. 16,688, 14,793–94, 16,691–93, 16,835). Economics and job opportunities were also major factors in black migration. (Tr. 595, 600, 676–78, 713, 796, 911, 914, 1052, 1089, 1103, 1111, 1163, 1307, 1312, 1318, 1552, 1579–80, 1680–81, 1728, 2781, 3214, 3267, 18,527, 18,550, 16,842). Often jobs would pull migrants to the city and then availability of schools would influence, more specifically, what housing choice would be made within the city. (Tr. 16,688).

Dr. John Kain, plaintiffs' expert on the determinants of residential location, predicted dispersed racial residential patterns would exist in Kansas City if race were not a factor in housing choices. (Tr. 7515–7529). Dr. Kain used three indicators to predict housing choice: income, type of family, and whether there were school-aged children. (Tr. 7489, P. Ex. 1265 series). His conclusion was that absent housing

discrimination blacks would be dispersed throughout the metropolitan area. (Tr. 7719, P. Ex. 1265G). Dr. Kain discounted or rejected other factors such as job location, ethnic clustering and personal preference. (Tr. 7473–76, 7846). The Court disagrees to the extent Dr. Kain rejected the possible influence of other factors in his analysis.

The intensity of segregation is demonstrated by the fact that the average black family lives in a census tract that is 85% black while the average white family lives in a census tract that is 99% white. (Tr. 14,739, 14,745). Regardless of their motivation for coming, once here, blacks settled in the inner city or, the "principal black contiguous area." (Tr. 10,837–38, 10,847–49). Plaintiffs' witnesses blame this black concentration (and ensuing white flight from it) on the dual school system, the enforcement of restrictive covenants, site and tenant selection policies for low income housing and other government practices and policies as well as on private discrimination. (Tr. 12,974, 12,976, 13,024, 13,032–13,035, 13,040–41, 13,043, 13,046–47, 13,-058–62, and 13,123–24).

Not surprisingly, Missouri defended with experts whose opinions declared economics, accessibility to jobs, spacial barriers, personal preference and private discrimination were the factors affecting black movement. (Tr. 19,102, 19,104–05). They all discounted or totally rejected schools and the dual school system as having any effect. (Tr. 18,620–24, 18,627–28). To the extent those experts deny the influence of schools in housing patterns, particularly in the context of Missouri's legacy, their opinions are rejected.

The Court finds the dual housing market (Tr. 12,974–76), which still exists to a large degree today (Tr. 12,008–09, 12,339), impacted blacks in the KCMSD and consequently caused the public schools to swell in black enrollment. The Court finds there is an inextricable connection between schools and housing. "People gravitate toward school facilities, just as schools are located in response to the needs of the people. The location of schools may thus influence the patterns of residential development of a metropolitan area and have important impact on composition of inner city neighborhoods," *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 20–21, 91 S.Ct. 1267, 1278–1279, 28 L.Ed.2d 554 (1971).

There were many witnesses called and literally weeks of testimony concerning the cause of blacks settling in the inner city of Kansas City and within the KCMSD. This testimony was relevant as to the suburban school districts and HUD. It was not relevant on the claims of plaintiffs against the KCMSD and the State of Missouri because those defendants had an obligation to the black students regardless of why they settled in the school district. As will hereafter be pointed out, the Kansas City District school system had never been totally integrated. In *Davis v. East Baton Rouge Parish School Bd.*, 721 F.2d 1425 (5th Cir. 1983), the school board tried to justify its one-race schools on the basis that they resulted from demographic patterns for which the school officials had no responsibility. The Court held that the Board's argument failed, stating:

> The Board's reliance on housing patterns as justification for the continued existence of one-race schools is not only factually but legally unsound....

> Until it has achieved the greatest degree of desegregation possible under the circumstances, the Board bears the continuing duty to do all in its power to eradicate the vestiges of the dual system. That duty includes the responsibility to adjust for demographic patterns and changes that predate the advent of a unitary system. [citations omitted]. The racial isolation of some schools, whether existing before or developing during the desegregation effort, may render disestablishment of certain one-race schools difficult or even impossible. Until all reasonable steps have been taken to eliminate remaining one-race schools, however, ethnic housing patterns are but an important factor to be considered in de-

termining what further desegregation can reasonably be achieved; they do not work to relieve the Board of its constitutional responsibilities.

*Davis,* 721 F.2d at 1435. The Court, therefore, will focus on the anatomy of the KCMSD.

Plaintiffs allege the KCMSD could have done more than it did to stably integrate its schools. (Tr. 14,892–93). Plaintiffs are quick to point out, however, that the District was faced with a pervasive system of segregation and would more than likely end up "resegregated" like all major cities. *Id.*

The Court notes that several witnesses used the term "resegregated" when describing racial change in the schools and housing patterns, usually changing from predominantly white to predominantly black. That may be correct terminology in the context of their testimony but the Court finds it has no legal significance. A segregated District cannot become resegregated until it is first integrated. The KCMSD has not yet become integrated on a system-wide basis.

As a consequence of their failure to do more, plaintiffs allege there are lingering effects of the dual school system. The District also blames the prior dual system for its present status, maintaining the State did nothing to relieve the conditions it created. Several witnesses confirmed the conclusion reached by the Supreme Court in *Brown I* that forced segregation ruins attitudes and is inherently unequal: "[Segregation] may affect their hearts and minds in a way unlikely ever to be undone." 347 U.S. at 494, 74 S.Ct. at 691. (Tr. 16,414, 16,416 16,422). The general attitude of inferiority among blacks (Tr. 1,920–21) produces low achievement (Tr. 16,573) which ultimately limits employment opportunities and causes poverty. (Tr. 2,453–56, 16,414, 16,457–58). While it may be true that poverty results in low achievement regardless of race, (Tr. 16,508), it is undeniable that most poverty-level families are black. (Tr. 16,422). The District stipulated that as of 1977 they had not eliminat-

ed all the vestiges of the prior dual system. (Stipulation introduction filed 2/21/84). The Court finds the inferior education indigenous of the state-compelled dual school system has lingering effects in the Kansas City, Missouri School District.

*Racial Composition of the School District:* In the 1954–55 school year, 18.9% of the District's 63,487 students were black (stipulation 2, Def. Ex. K–2). Because the State compelled separate schools for blacks, the District established and maintained segregated facilities with segregated staffs. In 1954, the KCMSD operated 90 schools of which 14 elementary, 1 junior-high vocational school and 1 high school-junior college were for black students. (Stipulation 5, Def. Ex. K–2). Those schools were located in the black-concentrated areas (Stipulation 6) and as that community expanded in a southeast direction so did the black schools. (P. Ex. 20, 740, 741, 742 map series, 1653; Tr. 3,577–78, 12,990–92).

The white students in the District during this period attended one of the 62 elementary schools, 3 junior high schools, eight high schools (1 with a vocational school) or the junior college. (Stipulation 10, Def. Ex. K2).

The KCMSD was majority white in enrollment until 1970 (Def. Ex. K–2, Tr. 17,-009), and could have achieved a mathematical racial balance in its schools until that year. (Tr. 17,010–12). Instead, the District chose to operate some completely segregated schools and some integrated ones. (Def. Ex. K–2). Regardless of some school officials' feelings that a more mathematically oriented plan would be less stable Tr. 17,205–207, the District's chosen path was ineffective in integrating its school system.

As of 1977, 25 one-race schools under the pre-1954 system remained 90% or more of the same race. (Def. Ex. K54, Stipulation 85, 86; Tr. 16,980). In addition, there were four black schools from the dual system that were still predominantly black when they closed in 1968. (Tr. 16,999–17,001). In summary, as of 1974, 20 years after *Brown I,* 39 schools were more than 90%

black; another 38 had 10 to 90% black enrollment. Eighty percent of all blacks in the District attended schools that were 90% black; only 19% of the blacks attended a school that was 10 to 90% black. (Stipulation 84).

With the adoption of Plan 6C (discussed *infra*) in 1977, the District eliminated the 16 entirely white schools and reduced the number of 90 + % black schools to 28. (Tr. 16,567). During the 1983–84 year, no school had less than 30% black enrollment; 24 schools however are racially isolated with 90 + % black enrollment. (Tr. 16,568, Def. Ex. K–2). The Court finds the District did not and has not entirely dismantled the dual school system. Vestiges of that dual system still remain.

*Liberal Transfers.* During the pre-1954 days, the District utilized a liberal transfer policy within each system, (Stipulation 11), allowing students to transfer to any open (uncrowded) school. (Stipulation 23, 24, 56; Tr. 16,940). Blacks did not use the liberal transfer policy as frequently as whites. (Tr. 2,010, 3,544; Stipulation 61). The Court finds the liberal transfer policy was not adopted or maintained to foster segregation even though it allowed whites living in racially transitional neighborhoods to transfer within the District to whiter schools. (Stipulation 57, Tr. 16,941–42).

Critics of the transfer policy blame its liberality for the racial turnover in schools by not compelling whites in that attendance area to attend that school. (Tr. 6,604–05; Stipulation 50, 56; P. Ex. 2780). Others, however, attribute the policy with fostering stabilization in transitional neighborhoods, slowing white flight and thus aiding integration. (Stipulation 56; Tr. 3,025–26, 13,-663–64).

In the years following *Brown*, the District attempted to accommodate varying views regarding the effect of the transfer policy. (Stipulation 58, 59, 60, 61 and 62) and made adjustments in both the liberality and review of the proposed transfers. (Tr. 16,556–57). When the District proposed abandoning the liberal transfer policy in order to satisfy federal OCR officials and retain federal funds, an integrated neighborhood organization sought to enjoin the abandonment fearing it would produce more white flight. (Tr. 13,662–64). The District did however revoke the policy pursuant to OCR directives (Tr. 13,667). In 1973, race was considered in transfer requests, giving preference to transfers that would promote integration. (Tr. 13,738). The Court finds the evolution of the transfer policy was not motivated by racial animus.

*Neighborhood Schools:* In response to the *Brown II* decision in 1955, the District adopted an assignment system known as the neighborhood school plan. (Stipulation 12, 13). Pursuant to this plan, the separate racial zones were eliminated and attendance areas were drawn around each school based on the buildings' capacity, distances involved, and other factors like safety, transportation and terrain. *Id.* By calculating the number of students in each attendance area, the District projected enrollment and expected racial composition for its various schools. Contrary to its predictions, many of the previously black schools opened with more than 92.5% black enrollment; 921 whites were predicted at these schools yet only 117 were present during the official census taken that fall. (Stipulation 22). White enrollment in the District decreased by approximately 1,200 between 1954–55 and 1955–56. *Id.* (P. Ex. 582, 584, 584B, 585, 586, 740, 743, 744). Because most of the schools were in racially segregated neighborhoods before 1954, the Court finds adoption of the neighborhood school concept did not substantially change the segregated school system.

*Attendance Zones:* Following *Brown*, the District made frequent shifts in the attendance areas of elementary and secondary schools as the population shifted, depending upon the capacity of various buildings. (Tr. 3,028; Stipulation 16 through 20, 29 through 31, 34, 37, 41, 43, and 48). In June, 1963, the District's proposed attendance zone changes were challenged by a group of residents who charged the changes would resegregate the schools and

neighborhoods. (Stipulation 49). The Board in response, modified its plans and adopted a policy statement recognizing that integration was an important factor to be considered in the District's decisions. (Stipulation 50 through 52). Nevertheless, the attendance zone changes did not achieve system-wide integration.

In addition to the regular attendance zones, various "optional" zones were utilized to allow students in those areas to choose among several schools. (Stipulation 31, 34, 51). Many of those optional zones existed before 1954, (*see* P. Ex. 739, 740; maps) and continued thereafter. (Stipulation 34). Regardless of the intent, e.g. to relieve overcrowding, (Tr. 2,011–13, 16,937–38), the Court finds the use of these optional zones, coupled with the liberal transfer policy, did not aid to integrate the District; to the contrary, it allowed attendance patterns to continue on a segregated basis.

*Intact Busing:* From the mid-1950's through the 1970's the District was faced with overcrowded conditions. (Tr. 16,948–49; 6,583, 6,548–49, 7,305–06). Besides adjustments to attendance zones, in the mid-1960's, the District also adopted a busing program. The Board declared that the busing program was not for integration but was required to relieve overcrowded conditions at some schools. (Stipulation 53). While the Board added it would aid integration when possible, it chose to bus entire classrooms of black students to predominantly white schools but to keep them as an insular group, not allowing them to be mixed with the receiving population. (Tr. 7146–47, 8,612). In the face of civil rights protests, in 1965, the bused students were integrated into the regular enrollment. The Court finds the District's use of intact busing had a segregative intent and effect. Because the practice was stopped in the 1960's, however, no continuing violation exists. Certainly black children subjected to that experience well remember the feelings of isolation and inferiority obviously produced by the practice.

*Middle School:* In 1965, a bond issue was passed to build three new schools in order to relieve the overcrowding in the Central area. (Stipulation 63). Because local civil rights groups protested the proposed site locations as being segregative and ineffective to relieve overcrowding, the District hired a consultant, Dr. Havighurst, to make a report and recommendation for the new sites. (Stipulation 64). His final report proposed, *inter alia*, a middle school at the Paseo and Brush Creek to stabilize a transitional neighborhood and retain its integrated character. (Stipulation 64, 67). After 1½ years of debate, the Board rejected this portion of Dr. Havighurst's recommendations stating there was a lack of funds and it did not appear that integration could be maintained. (Stipulation 67). Some blacks viewed the District's failure to adopt the middle school as a step toward continuing the segregated school conditions. (Tr. 3017–20). The Court finds that reasonable minds could differ as to the effect and ability of the middle school to help integrate. (Tr. 16,478–79).

*Concepts for Changing Times:* At the instance of several community and civil rights groups, Superintendent Hazlett, in 1968, presented a document "Concepts for Changing Times," in which various proposals for district-wide integration and stabilization were suggested. (P. Ex. 414, 414A, 2603; Stipulation 69). The Board appointed a bi-racial committee (committee of 30) to study the "Concepts" and make recommendations. The Committee generally endorsed the ideas (P. Ex. 414E through K, 2780U and V) however, the Board never voted on the proposals and none were otherwise acted upon. (Stipulation 69). In fact there was no district-wide desegregation plan adopted by the KCMSD until Plan 6C was implemented in 1977–78. *Id.*

As indicated *supra*, as the black population expanded from the central city in a southeast direction, neighborhoods and schools experienced a racial transition. As blacks moved, or were bused to the schools, in the area, whites moved out. (Tr. 8715–16, 8721–30, 9228–32, 9235). Several community groups attempted unsuccessfully, to maintain an integrated neighborhood and stabilize the often rapid transition. (Tr. 9,347–48, 9,395–96, 13,631–32).

In 1965, the Kansas City Commission on Human Relations issued proposals to stabilize the southeast area. (Stipulation 70). Many of which were adopted by the KCMSD. Racial turnover continued unabated, however, with the efforts proving to be little more than a thumb in the dike. (Stipulation 71).

It is interesting to note that in the 1958–59 school year there were 52,491 white students in KCMSD. It had 14,952 black students which comprised 22.5% of the total enrollment. The highest enrollment in the past 30 years occurred in 1967–68 when there was a total enrollment of 74,997 students. The largest enrollment of blacks occurred in the 1971–72 school year when there was a total of 35,620 black students enrolled. In the 1983–84 school year the total enrollment in the KCMSD was 36,650 students, 10,022 whites and 24,803 blacks with a percentage of 67.7% black. The total enrollment from 1967–68 to 1983–84 has been reduced more than 50%. Enrollment of whites between 1958–59 and 1983–84 has been reduced by 80%. The black enrollment from 1971–72 to 1983–84 has been reduced by approximately 30%.

Plaintiffs contend that the State established a system of area vocational schools that effectively segregated students on the basis of their race and that the methods of funding these schools were racially discriminatory. The Court addressed this issue in its June 5 order dismissing the suburban defendants.

The Kansas City Technical Center is an AVTS for all high schools in KCMSD. It was the first AVTS formed in the Kansas City area. It served all students in the KCMSD regardless of race. There is no proof that the formation of this school has prolonged or contributed to the segregation in the schools in the KCMSD. DESE administers vocational educational funds without regard to race and all districts are treated alike. (Tr. 17,939).

The State has been of some aid to school districts in the State which have segregation problems. When a Missouri school district received an OCR complaint, the DESE sent a letter to the district offering the department's assistance. (Tr. 17,464). A Technical Assistance Unit (TAU) was established, funded by federal funds, which provides assistance to school districts involved in voluntary or court ordered desegregation upon a district's request. (Tr. 17,-667). It also notifies the eligible districts of other services which can be provided under the conditions of the federal grants. The TAU proposal for funding to the federal government explicitly names St. Louis and Kansas City school districts as priority areas for technical assistance. (Tr. 17,684). KCMSD has requested and been provided TAU assistance. (Tr. 17,682, 17,785; St. Def. Ex. M–2).

The DESE also provides valuable assistance to urban school districts through its Urban Education Section. (Tr. 17,592–604).

### Claims Against HUD

Plaintiffs have made numerous claims that the Department of Housing and Urban Development (HUD) violated its responsibilities under the Fifth Amendment of the United States Constitution, Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, *et seq.*, Title VIII of the Civil Rights Act of 1968, 42 U.S.C. § 3601, *et seq.*, and the applicable housing laws and regulations.

Title VI, § 601 of the Civil Rights Act of 1964, 42 U.S.C. § 2000d provides "no person in the United States shall, on the grounds of race, color or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." Title VIII, 42 U.S.C. § 3601 (known as the Fair Housing Act) declares that "it is the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States." The Act contains a number of detailed provisions banning discrimination on the basis of race, color, religion, sex or national origin in the sale or rental of housing, the financing of housing and the provision of brokerage services. *See,* 42 U.S.C. §§ 3604, 3605, 3606. The Act further makes it unlawful to inter-

fere with any person's exercise of enjoyment of these rights. 42 U.S.C. § 3617.

Before analyzing some of the myriad claims made by plaintiffs it may be helpful to briefly summarize the basic goals of the federal housing programs. The United States Housing Act of 1937, 42 U.S.C. §§ 1437–1437j, was originally enacted to remedy the unsafe and unsanitary housing conditions and the acute shortage of housing for families of low income. It authorized HUD to make loans and annual contributions to local public housing agencies (PHAs) to develop, operate and maintain low rent public housing projects for families with low income. 42 U.S.C. §§ 1437b–1437c. Congress sought to achieve this goal by vesting the responsibilities of the administration of these housing programs in local housing agencies.

Under the 1934 Act, FHA guaranteed or insured payment of residential mortgage loans for those of low income who qualified, making it possible for low income people to purchase homes with very low down payments and interest rates below the national average. In 1954 the Act was amended under 12 U.S.C. § 1751(d)(3) and (4) to provide mortgage insurance to developers, including public bodies, of multi-family rental or cooperating housing for moderate income or displaced families. The Housing Act was again amended in 1959, 12 U.S.C. § 1715v to make mortgage insurance available to facilitate the financing of rental housing for the elderly or handicapped.

The Act was amended in 1974 by the Housing and Community Act of 1974 which had as part of its objectives the elimination of slums and the renewal of older urban areas. 42 U.S.C. § 5301. It specifically recognized that the concentration of persons of low income in the central cities was creating social, economic and environmental problems. In 1977, 42 U.S.C. § 1439 was amended to place greater emphasis on local housing assistance plans. The primary goal of the federal housing program is to provide decent housing for the poor; however, its secondary concern is to develop and maintain stable, desirable urban communities.

The § 235 program [12 U.S.C. § 1715z 1968] combined mortgage insurance with HUD mortgage subsidy payments to the lender in amounts determined by the buyer's income. The § 236 program was authorized in 1968, 12 U.S.C. § 1715z–1. In addition to mortgage insurance HUD provided interest subsidies to nonprofit, limited dividend or cooperative programs to reduce interest rates to an extremely low level.

Section 8, 42 U.S.C. § 1437f, (Housing and Community Development Act of 1974) provided for rental subsidies to lower income persons by payments directly from HUD to landlords including public bodies. Under § 8 the rental subsidy is tied to the tenant not to the property. In other words the § 8 certificates are HUD's guarantee of the rental subsidy. The tenants are responsible for finding their own housing although the administering housing authority may be able to direct the certificate holder to landlords who have indicated a desire to have § 8 tenants. If the prospective landlord does not agree to participate in the program, the tenant must take the certificate somewhere else or forego the subsidy. Also if the certificate holder moves from one qualified apartment to another, the lessee takes the certificate along.

*Scope of Judicial Review*

Plaintiffs have not alleged nor have they met the statutory prerequisites for filing a private action under Title VI, § 2000d *et seq.*, nor under Title VIII, 42 U.S.C. §§ 3610 or 3612, requiring such complaint to be filed within 180 days of the alleged discrimination.

Plaintiffs have properly proceeded on the basis that HUD has violated their rights to "the equal protection of the laws" as guaranteed by the Fifth Amendment of the United States Constitution. *Davis v. Passman*, 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979), *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

██ The standard of review for HUD's actions are the same as those for

HEW which were set forth in this Court's order of July 16, 1984 (pp. 21 and 22). Briefly, there must be a showing that in administering the federal housing programs in the Kansas City area its actions were arbitrary and capricious, without a rational basis, it did so with discriminatory intent or purpose, and there is a causal connection between the violation and the injury, the segregated schools in the KCMSD. *City of Memphis v. Greene*, 451 U.S. 100, 119, 101 S.Ct. 1584, 1596, 67 L.Ed.2d 769 (1981); *Washington v. Davis*, 426 U.S. 229, 239–241, 96 S.Ct. 2040, 2047–2048, 48 L.Ed.2d 597 (1976); *Alschuler v. Dept. of Housing and Urban Development*, 686 F.2d 472 (7th Cir.1982); *Clients Council v. Pierce*, 711 F.2d 1406 (8th Cir. 1983). Discriminatory purpose "implies that the decisionmaker ... selected or reaffirmed a particular course of action at least in part 'because of' not merely 'in spite of' its adverse effects upon an identifiable group." *Personnel Administrator of Mass. v. Feeney*, 442 U.S. 256, 279, 99 S.Ct. 2282, 2296, 60 L.Ed.2d 870 (1979).

■ Plaintiffs claim that FHA's appraisal practices prior to 1949, and even thereafter, contributed to segregated housing in the Kansas City area. Clearly, FHA's appraisal manuals for 1936 (P. Ex. 1303) and 1938 indicated racial restrictive covenants would tend to insure a stable community thus enhancing the value of the property. In 1947 and thereafter emphasis was placed on such considerations as to whether there was a probability of a change in occupancy, that in a change from one user group to another the successor group exhibits a lower income level. The manual also pointed out that a neighborhood would probably remain more stable where there was compatibility among the neighborhood occupants. (P. Ex. 1305). By 1947 reference to racial restrictive covenants was deleted from its manual and it has refused to insure the mortgage on any property which contained such restrictions. Insurance of mortgages by FHA incurs a risk of loss of federal funds. Racial restrictive covenants were intended to cause housing segregation. While such covenants were brought about by private action they were enforced by the courts of Missouri until after the case of *Shelly v. Kraemer*, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 was decided in 1948. Even though such covenants were discriminatory without a doubt they did have an effect on the market value of residential property. FHA did not enforce the covenants; however, it accepted the fact that Missouri courts did enforce them. FHA was faced with this reality and could not ignore it in making a determination as to the maximum risk which should be incurred with funds of a federal agency. In view of this FHA did not act arbitrarily nor capriciously in giving these covenants consideration in arriving at an appraisal. As demonstrated by Ex. P. 22, the areas most affected by these covenants soon were occupied by blacks after the covenants were no longer enforceable. There was no evidence showing the number of FHA insured mortgages in the restricted areas.

Prior to 1950 FHA insured approximately 15,000 homes in the KCMSD. (Ex. FD37A). Between 1950 and 1980 there were in excess of 2,000,000 housing turnovers in this area. If FHA's appraisal practices prior to 1950 had any effect on present racial housing patterns, it would, at most, be *de minimus*.

■ Plaintiffs claim that HUD violated its Title VI and VIII obligations when it continued to fund the Kansas City Land Clearance for Redevelopment Authority (LCRA) after it knew that the LCRA was following racially discriminatory practices. In 1953 the LCRA was established by Kansas City, Missouri to administer urban renewal programs under the Housing Act of 1949. HUD provided federal funds to assist in urban renewal and neighborhood development activities. (Ex. FD204C). After receiving the complaint that LCRA was practicing racial discrimination in its relocation activities, HUD made a Title VI complaint investigation. In that investigation HUD found that blacks were being located primarily in the southeast part of Kansas City while whites were relocated throughout the Kansas City area. (P. Ex. 2913A). As a result of the Title VI investigation,

LCRA was required immediately to cease such discriminating practices and to file reports with HUD so that HUD could monitor their referrals. The reports were to be filed with HUD every 90 days (Ex. P2913A). LCRA failed to file its reports in a timely fashion. (Tr. 11,601). The reports that were filed showed no significant improvements in LCRA's referral practices. As a result in June, 1973, HUD refused to fund the 1974 Neighborhood Development Program (NDP) unless the city assumed the responsibility for all relocation services. (Ex. FD204C). In June, 1973, HUD, LCRA and the City of Kansas City entered into a cooperation agreement by which the City assumed the responsibility for relocation under the urban renewal and neighborhood development plan. As part of this agreement each relocatee was to receive at least one referral outside of the "inner city." (Ex. FD239). The cooperation agreement required the City to file reports at least twice a month with reports to include the race of each displaced person, the number of dependents and the address of housing referrals. (Ex. FD239). Following this agreement, approximately ⅓ of the housing referrals provided to black relocatees were outside of the inner city area. (Ex. P322A, Tr. 10,991). The relocation reports show that between 1971 and 1976 only 174 black households were relocated during the six year period. (Ex. P622B). The Court finds that in working out the cooperation agreement between the LCRA and the City of Kansas City, Missouri, HUD acted in a reasonable and responsive manner. To have cut off funds would have penalized those most in need of housing, that is the people of low income, and could not have been done absent a lengthy Title VI investigation. The Court finds that by entering into the cooperation agreement between HUD, LCRA and the City of Kansas City, their actions were not arbitrary or capricious and did not violate plaintiffs' fifth amendment rights.

*Title VIII.* Plaintiffs contend that within the KCMSD, § 8 certificate holders are segregated by race. The Housing Authority of Kansas City (HAKC) administers the § 8 assistance program in Kansas City, Missouri in which HUD provides housing assistance payments to HAKC for § 8 participating tenants. (Tr. 12,197, 12,364). HAKC's § 8 program presently has 1,458 certificates in use with 16% white and 84% nonwhite. (Ex. P1481B). There are public housing authorities administering the § 8 assistance housing programs in Independence, Liberty and Lee's Summit, Missouri. These PHA's presently have 619 certificates in use with the racial composition 98% white and 2% nonwhite. (Ex. P1481A). By the nature of the § 8 program, participants may request a certificate from any issuing jurisdiction and then locate housing of their own choosing within the jurisdiction issuing the certificate. (Tr. 20,455). There was no evidence that HUD or the PHAs attempted to direct § 8 certificate holders as to the location of the housing which they chose.

Under the Public Housing Act of 1949, P.L. 81–171, 63 Stat. 413, Congress recognized that the problem of providing decent housing for low income families was "clearly related and practically inseparable from the problem of clearing urban slums." In other words, the 1949 Act created a slum clearance program. Congress provided loans and capital grants to clear the land and then make it available for redevelopment in accordance with locally devised plans for the area. This was reaffirmed by Congress in the 1954 Housing Act, P.L. 83–560, 68 Stat. 590. The urban renewal projects were required to be located in areas for which the community had a plan for both slum clearance and redevelopment. HAKC has nine projects for family occupancy under management containing a total of 2,270 units. (Ex. P1609). HAKC constructed seven family projects between 1952 and 1963 all either within the model cities or urban renewal areas. (Ex. P2917). The Housing Authority had two other family projects containing 50 units each consisting of single family homes located throughout Kansas City, Missouri. (Ex. P1609).

At the outset HAKC followed the "freedom of choice plan." In 1968 HAKC adopted a new assignment plan in accord-

ance with HUD regulations which required applicants to select a suitable vacant unit from among the three development locations with the highest vacancy rate or be removed to the bottom of the waiting list. (Ex. P1596FFF). In 1976 HUD made a Title VI investigation of HAKC's assignment practices. It found that HAKC was allowing applicants to choose a suitable vacant unit in any development rather than giving a choice only of a unit among the three developments with the highest vacancy rate. (Ex. P1596FFF). Following the investigation, HAKC and HUD entered into a compliance agreement in which HAKC adopted a new tenant assignment policy. This policy required that applicants be assigned to suitable units at one of the three developments with the highest vacancy rate. In addition it provided for a minority preference housing option. This feature of the plan allowed for the immediate placement of any applicant or transfer of any resident to a development in which the applicants or tenants racial group comprised 33⅓% or less of the development's population. (Tr. 12,225, Ex. P1596GGG). The Court finds that the location of the public housing was in accordance with the congressional acts and that HUD's monitoring of the program was neither arbitrary nor capricious and that the compliance agreement entered into between HAKC and HUD was reasonable.

Plaintiffs also contend that HUD assisted multi-family housing caused the overwhelming majority of these units to be located within the KCMSD. The Court finds that HUD followed a balanced housing policy and attempted to insure that assisted housing located in the inner city area was balanced by assisted housing projects in the suburban areas. (Tr. 20,-657). HUD reviewed all proposals for multi-family housing projects to include racial characteristics of the project area. (Tr. 20,408–09). HUD had disapproved some proposed projects because they were located in areas of minority concentration. (Tr. 20,563–68). The evidence indicates that there has not been a lack of balance between federally assisted housing within the KCMSD and the suburban areas. Plain-tiffs' Exhibit 27B reflects that there were 6,832 HUD insured or subsidized multi-family units within KCMSD and 9,872 such units in the 11 suburban school districts (which have been dismissed in this action). This indicates that HUD did follow a balanced housing policy. HUD published site selection regulations known as "Project Selection Criteria", 24 C.F.R. § 200.700 et seq. Without setting forth the criteria, they were sufficient to enable HUD to make a reasonable determination that a particular project was in compliance with Titles VI and VIII. There was no evidence in the case that the practices of HUD in site selection and approval for federally subsidized multi-family housing had a substantial effect upon the racial makeup of schools within the KCMSD. A good example is the East Hills Village located in the Knotts Elementary School attendance zone. The East Hills Village project was approved by HUD in 1971. (Ex. P27B). In 1971 when the project was approved by HUD, Knotts School was 84% black and in 1973 when the East Hills Village project was opened, Knotts School was 91.9% black. (Ex. K–2). When East Hills Village opened there were 30 elementary school age children, 27 black and 3 white. (Ex. P1199). Ten percent of the children were white, ninety percent were black. The black percentage was higher in Knotts School than that reflected in the East Hills Village project.

Although the evidence showed that HUD assisted housing was not concentrated within KCMSD, plaintiffs nevertheless asserted that most blacks who resided in assisted housing lived within the KCMSD. Even assuming that this is true, it does not show a Title VIII violation on the part of HUD. HUD established affirmative marketing regulations, 24 C.F.R. §§ 200.600, 841.202 and 880.206, and the evidence reflects that the Kansas City HUD office monitored these affirmative fair housing and marketing plans very closely. A detailed description of HUD's review and monitoring of the affirmative fair housing marketing plans was provided by Elaine Owens. (Tr. 20,413–431; 20,516–521).

Each project sponsor was required to establish an "anticipated occupancy goal" for tenants which was both realistic for the project area and which would provide greater integration than the current racial mix of the area. (Tr. 20,419, 20,516–17). The review also assured that advertising and contact with the community groups were adequate to reach persons who would not otherwise be expected to apply for such housing. (Tr. 20,415–19). Its review involved a pre-occupancy conference with the sponsor to discuss the provisions of each marketing plan and how the plan was to be implemented as well as an appraisal of the sponsor's past affirmative marketing experience. (Tr. 20,420–23). With respect to HUD's monitoring of the plans, sponsors were required to submit monthly occupancy reports until the project was 95% occupied. Thereafter, occupancy reports were to be submitted annually. (Tr. 20,423–24). HUD also monitored the Equal Housing Opportunity Plans under § 8 housing programs. (Tr. 20,431–33). Generally its efforts were designed to insure that participating § 8 certificate holders were made aware what affordable housing was available to them throughout the entire community and that the public housing authorities informed them of their rights under the fair housing laws. HUD made annual monitoring visits to all PHAs in the Kansas City area that administered § 8 programs. (Tr. 20,453–54). Undoubtedly the affirmative fair housing marketing plans did not result in the integration which HUD desired; however, this was not the result of the lack of affirmative marketing efforts. A good example was the evidence concerning Parvin Estates which was located in predominantly white north Kansas City. (Tr. 12,542–43). Mrs. Ruth Sechter testified at length concerning the marketing plans imposed in the development of Parvin Estates. She stated that the plan had been successful in making blacks aware of the openings at Parvin Estates but they were unsuccessful in attracting the expected number of black families to the project. She attributed this to reasons that were beyond the sponsor's control and not the fault of the plan. (Tr. 12,582). This project contained 300 units; however in spite of the affirmative marketing efforts, they were never able to attract more than 12% minorities. The occupancy rate for blacks was actually lower. (Tr. 12,562). Certainly there was nothing about the marketing regulations or the manner in which they were implemented and monitored which was arbitrary or capricious.

Plaintiffs also asserted that blacks were routinely denied FHA mortgage insurance well past 1954. There was no evidence whatsoever to support plaintiffs' contentions in this regard. Mr. Newsome, with 23 years experience as a real estate agent, was not aware of a single instance in which FHA had refused to insure a mortgage loan because of race. (Tr. 9,439, 9,517). The only evidence on the issue was to the effect that race was not a factor in HUD's decision to insure a home mortgage loan. (Tr. 19,925–26, Treu Depo. at 60; James Depo. at 15). Since 1962 FHA has required a certification of compliance with its non-discrimination policy by all lenders, buyers and sellers. (Ex. FD45A & B, 46A & B, and 350 [*see* 24 C.F.R. § 200.300 *et seq.*]).

Plaintiffs also claimed that there was racial discrimination in the sale of homes in which the FHA insured mortgage had been foreclosed. Plaintiffs maintain that many management brokers maintained separate lists of these homes, one for whites and one for blacks, and presold homes in white areas to whites to avoid the possible purchase by blacks. The evidence reflected only one instance in which this occurred. Ms. Dorothy Davis testified that in 1966 Mr. Homer Ritch, a management broker agreed to sell property to her several days before it was advertised to the general public. (Tr. 11,730). HUD investigated Mr. Ritch's conduct which resulted in an official reprimand by HUD and a nonrenewal of his contract to manage HUD properties. (Tr. 11,746). HUD immediately altered the manner in which such homes were sold to prevent any future occurrences of preselling. (Tr. 11,732–33). Under the new procedure, all proposals for the sale of HUD owned properties had to be

submitted directly to HUD not to management brokers and no proposals were received until the Monday following the Thursday advertisement of the property. (Tr. 11,732–33). The most detailed evidence concerning HUD's property disposition was in the deposition testimony of Jaspar Levine, the Director of HUD's property disposition branch between 1965 and 1979. Summarily, he testified that HUD maintained the property in good condition so that they would not blight the neighborhoods. (Levine Depo. at 26). When title to the property was acquired by HUD, a repair list was prepared, contracts were let for the repair, and the repair work was performed. (Levine Depo. at 27,31). If property remained unsold for a period of 30 to 60 days, it was normally taken off the market, further repaired and re-advertised for sale. (Levine Depo. at 28). Homes that needed only minor repairs were offered for sale in an "as is" condition. (Levine Depo. at 26). The evidence showed that HUD held properties were available for sale to all members of the general public regardless of race. (Tr. 11,726, Levine Depo. at 79). Properties held for sale were advertised in the Kansas City Call, a black newspaper, and the Kansas City Star and Times. (Tr. 11,726–27). A list of HUD held homes that were ready for sale was regularly mailed to all interested persons. (Tr. 11,727). The evidence does not support plaintiffs' contention that HUD's practices in the sale of homes on which its insured mortgages had been foreclosed was racially discriminatory.

■ There was evidence that some HUD held homes in the Southeast Corridor were allowed to deteriorate and fall in disrepair. Assuming the accuracy of this testimony there was an absence of any evidence to support a finding that such neglect of the property by HUD was because of racially discriminatory intent or purpose.

### Various State Agencies

■ Plaintiffs contend that the following state agencies had an opportunity to reduce the impaction of blacks and minorities in the inner city of Kansas City: the Missouri Housing Development Commission, the Division of Finance, Division of Savings and Loan Supervision, the Division of Insurance, the Missouri Real Estate Commission, and the Missouri Commission on Human Rights. In view of this Court's finding that the State had an obligation under the fourteenth amendment to assure that blacks within the KCMSD were not denied the equal protection of the laws regardless of why they settled within the KCMSD, the evidence concerning the aforementioned state agencies will be addressed only very briefly.

■ Plaintiffs contend that the State and particularly the Missouri Department of Highway and Transportation (MDHT) have managed its relocation program for persons displaced by highway projects in a manner that had a racially segregative effect. Their main complaint was the location of the I–70 route which was first chosen in 1956 when the interstate system took effect (Tr. 18,243) and at a time when the KCMSD was overwhelmingly white. (Def. Ex. K–2). I–70 was financed by both federal and state funds (Tr. 18,243). I–70 generally followed the route of what was previously U.S. Route 40 (Tr. 18,248) and was chosen to serve the existing traffic patterns as they then existed and were anticipated to continue. The I–70 project had to be approved by the Federal Highway Administration. (Tr. 18,246). Planning for this project was generally approved by various agencies of the city government. (Tr. 18,246–47). It goes without saying that the location of a highway and particularly an interstate highway through a residential area will displace a certain number of residents in that area. There is no proof whatever that the State's action as it related to the construction of the I–70 project amounted to any constitutional violation.

Plaintiffs contend that in its relocation program for the South Midtown Freeway (SMF), MDHT managed its program in a manner which resulted with blacks who were displaced being located in areas which were predominantly black and the whites being located in suburban areas which

were predominantly white. The Court finds that the location for the SMF generally followed existing patterns of traffic and was probably the most feasible and reasonable location for the freeway and insofar as the freeway location was concerned, there was no constitutional violation on the part of the State. (Tr. 18,258). Again, the plans for the freeway had to be approved by the federal government. (Tr. 18,298). It was necessary for a relocation plan to be prepared and submitted to the U.S. Department of Transportation for approval for funding. (Tr. 18,032–33). Relocatees who requested assistance from MDHT were assisted in finding replacement housing. (Tr. 18,028). Relocation payments were authorized by the Uniform Relocation Act of 1970. (Tr. 18,019). On the initial contact, the relocatees completed a questionnaire which included the relocatee's preference for relocation. (Tr. 18,019–20). The relocatees did receive financial assistance dependent upon their circumstances. (Tr. 18,021–27). Relocatees were told to contact MDHT if at any time they felt they were the victims of discrimination but no such complaints were ever received by MDHT. (Tr. 18,031, 18,043). Generally, MDHT advised relocatees of the availability of houses and did not refer them to relators for this purpose. (Tr. 18,032, 18,041, 18,042).

The State contended that plaintiffs' claims that the State's location of highways and its management of its relocation programs were racially discriminatory should have been dismissed and no evidence on these issued admitted because the United States Department of Transportation was dismissed and the Highway Department for the State of Missouri was not a party. Without deciding the issue as to whether these claims should have been dismissed, the Court finds that there was nothing in the location of the highways nor in the operation of the MDHT's relocation program which amounted to a constitutional violation and for which the State of Missouri would be liable.

Plaintiffs claim that the State through the Missouri Housing Development Commission (MHDC) engaged in the implementation of federal housing programs which contributed to the creation and perpetuation of a dual housing market in the metropolitan Kansas City area. MHDC was created by the Missouri legislature in 1969 to provide loans to middle and low income persons. (Tr. 18,306–07). MHDC does not build or manage any developments but simply provides financing. (Tr. 18,307).

Its first financial commitment was on December 15, 1971 which was for three developments including Parvin Estates located in the North Kansas City Missouri School District. (Tr. 18,309). MHDC funds come from a sale of tax exempt bonds which provide the necessary proceeds for making loans to developers or in the case of single family programs to individuals to purchase mortgages under the single family home loan program. (Tr. 18,-310–11). MHDC received no federal funding but has been requested to administer certain section 8 housing assistance contracts and as a result receives funding directly from HUD in which MHDC acts as a conduit to distribute these funds to eligible mortgagors who in turn make principal and interest payments to MHDC. (Tr. 18,310–13). Nearly all projects in which MHDC participated are federally insured, either FHA or VA, and in some instances private mortgage insurance guarantees. (Tr. 18,-315). There was considerable evidence concerning the type of federally insured projects in which MHDC was involved; however, the Court sees no particular advantage in reviewing those projects in detail. State Exh. C–12 reflects the projects in which MHDC was involved and the location of those projects. It clearly appears that the majority of the units in which it was involved were located outside the KCMSD.

Plaintiffs and the KCMSD offered evidence of the alleged past racially discriminatory practices of private individuals in the fields of real estate, residential and commercial, financing, insurance and public accommodations. They seek to hold the state responsible for these activities because real estate brokers, banks, savings and loan institutions, insurance companies

and other entities claimed to have been engaged in this practice receive licenses from and are subject to regulation by the State of Missouri. There is no doubt that private entities did engage in discriminatory practices such as red lining, steering and blockbusting. As stated the discriminatory acts were committed by private individuals or entities. The only complaint involving illegal activities of realtors which was filed with the Missouri Real Estate Commission led to the permanent revocation of the real estate license of the agent involved. (Tr. 12,257–58). Other complaints were filed with the Kansas City Human Relations Committee which did receive an affirmative response from that committee. (Tr. 4721 and 4711–12). The mere fact that activities of these private individuals or entities were either licensed by or subject to regulation by a state agency does not convert the private action into state action for which the State of Missouri would be liable. However, private action may, in law, become state action when the state has exercised coercive power or has provided significant encouragement for the private discriminatory activity. This is clearly the teaching of the following cases without any further discussion concerning the holding in those cases: *Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972); *Blum v. Yaretsky,* 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982) and *Rendell-Baker v. Kohn,* 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982). There was no evidence whatsoever that the state agencies exercised coercive power or significantly encouraged the private individuals or entities in their discriminatory practices so as to make their actions the actions of the State. While these agencies, acting within the authority granted them by the General Assembly, committed no constitutional violation, the State could have given those agencies obligations and authority which could have aided in the disestablishment of the dual school system which it created. This Court cannot say what precise course the State should have taken at any particular stage in meeting its affirmative duty to disestablish the dual system; however, by acting through these

agencies, it could have at least partially met that duty. A finding that none of the aforementioned agencies committed any constitutional violation entitling plaintiffs to relief does not dispose of the question concerning the State's liability.

■ In the past the State has taken positive actions which were discriminatory against blacks. As previously stated, it mandated separate schools for blacks and whites; it established separate institutions for teaching black school teachers, § 10632 R.S.Mo. (1939); it established and maintained a separate institution for higher education for blacks at Lincoln University, § 175.050 R.S.Mo. (1949); it provided that school boards in any town, city or consolidated school district could establish separate libraries, public parks and playgrounds for blacks and whites, § 165.327, R.S.Mo. (1959); it made it a crime for a person of ⅛ Negro blood to marry a white person, § 563.240 R.S.Mo. (1959); and its courts enforced racially restrictive covenants. These actions had the effect of placing the State's imprimatur on racial discrimination. It created an atmosphere in which the private white individuals could justify their bias and prejudice against blacks. A large percentage of whites do not want blacks to reside in their neighborhood and a large percentage of blacks do not want to reside within a neighborhood in which they are not wanted. This has and continues to have a significant effect on the dual housing market in the Kansas City area. Thus, the Court finds that the State has encouraged racial discrimination by private individuals in the real estate, banking and insurance industries. Liability on the part of the State might be a very close question if it hinged solely on its encouragement of private discrimination. There is a much more salient reason for finding liability on the part of the State.

The KCMSD did not mandate separate schools for blacks and whites. The people of the State of Missouri through constitutional provision and the General Assembly through legislative enactments mandated that all schools for blacks and whites in

this State were to be separate. There is no room for doubt but what the State of Missouri intentionally created the dual school system. Under *Brown I, Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), this constituted a violation of the 14th amendment of the United States Constitution and no further proof of segregative intent is required. *Brown v. Board of Education,* 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955) (*Brown II*), *Swann v. Charlotte-Mechlenburg Bd. of Education,* 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); *Green v. School Board of New Kent Co.,* 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968); *Liddell v. State of Missouri,* 731 F.2d 1294 (8th Cir. 1984) and other cases decided by the Supreme Court and the various circuit courts clearly demonstrate that having created a dual system, the State and the KCMSD had and continue to have an obligation to disestablish that system. In *Keyes v. School District No. 1, Denver, Colo.,* 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973), the Court stated:

> [W]e have held that where plaintiffs prove that a current condition of segregated schooling exists within a school district where a dual system was compelled or authorized by statute at the time of our decision in *Brown v. Board of Education,* 347 U.S. 483 [74 S.Ct. 686, 98 L.Ed. 873] (1954) (*Brown I*), the State automatically assumes an affirmative duty 'to effectuate a transition to a racially nondiscriminatory school system.' *Brown v. Board of Education,* 349 U.S. 294, 301 [75 S.Ct. 753, 756, 99 L.Ed. 1083] (1955) (*Brown II*).

*Keyes,* 413 U.S. at 200, 93 S.Ct. at 2693. In *Dayton Board of Education v. Brinkman,* 443 U.S. 526, 99 S.Ct. 2971, 61 L.Ed.2d 720 (1979), the Court stated:

> But the measure of the post-*Brown I* conduct of a school board under an unsatisfied duty to liquidate a dual system is the effectiveness, not the purpose, of the actions in decreasing or increasing the segregation caused by the dual system.

*Dayton,* 443 U.S. at 538, 99 S.Ct. at 2979. Having found that there are still vestiges of the State's dual school system still lingering in the KCMSD, the obligations of the KCMSD and the State have not been met.

■ The State argues that under the Constitution of the State of Missouri and the statutes of the State, it was unable to take any affirmative action to dismantle the KCMSD's dual school system. In the general memorandum and order filed June 5, 1984, in discussing the local autonomy of public schools within the State of Missouri, it was stated at page 8: "The State of Missouri does not have the power to require a merger or consolidation of school districts." This statement by the Court was intended to reflect that the state statutes had vested that power in the school districts and had not retained it for the State. It is the conclusion of this Court that none of the provisions of the Constitution nor statutes of the State of Missouri would have prevented the State of Missouri from fulfilling its affirmative duty of disestablishing a dual school system subsequent to 1954. Article 9, § 1(a) of the Missouri Constitution requires the General Assembly to establish and maintain free public schools; Article 9, § 1(b) provides that schools for any contiguous territory may be established by law. Article 3, § 40(20) provides that the General Assembly shall not pass any local or special law "creating new townships or changing the boundaries of townships or school districts." There is nothing in the State Constitution which would prevent the General Assembly from enacting legislation which would give the State sole authority to establish school districts as it sees fit. If such legislation is the only means by which the State can fulfill its 14th amendment obligations, then such legislation is mandatory. It is clear that school districts in the State exist pursuant to the State Constitution and it is also clear that the General Assembly for the State of Missouri may abolish or create districts subject only to the requirement that the territory within the district must be contiguous and subject only to the provision that such may not be done except by general legislation as opposed to special

legislation. The General Assembly established the school districts and if it deems necessary, can change them even though to do so might require amendments of some of the present statutes. In this regard the General Assembly has authority which this Court does not have. The teachings of *Milliken v. Bradley,* 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069, as analyzed in *Hills v. Geautreaux,* 425 U.S. 284, 96 S.Ct. 1538, 47 L.Ed.2d 792 (1976) were to the effect that a federal court had no power to restructure the operation of local and state government entities absent a constitutional violation by those entities. Article 1, § 3 of the Missouri Constitution provides that the people of the State have the inherent, sole and exclusive right to alter or reform government whenever they deem it necessary. Article 1, § 4 of the Constitution acknowledges that it is a free and independent state subject only to the Constitution of the United States. Thus it recognizes that its laws must conform to the United States Constitution. As stated in *Milliken I,* "no state law is above the Constitution."

In *Cooper v. Aaron,* 358 U.S. 1, 19, 78 S.Ct. 1401, 1410, 3 L.Ed.2d 5 (1958), it was stated:

It is, of course, quite true that the responsibility for public education is primarily the concern of the States, but it is equally true that such responsibilities, like all other state activity, must be exercised consistently with federal constitutional requirements as they apply to state action. The Constitution created a government dedicated to equal justice under law. The Fourteenth Amendment embodied and emphasized that ideal. State support of segregated schools through any arrangement, management, funds, or property cannot be squared with the Amendment's command that no State shall deny to any person within its jurisdiction the equal protection of the laws.

In *Board of Education v. Swann,* 402 U.S. 43, 45, 91 S.Ct. 1284, 1286, 28 L.Ed.2d 586 (1971), the Court stated:

[I]f a state-imposed limitation on a school authority's discretion operates to inhibit or obstruct the operation of a unitary school system or impede the disestablishing of a dual system, it must fall; state policy must give way when it operates to hinder vindication of federal constitutional guarantees.

Even if the hands of state administrators such as the Commissioner of Education, the State Board of Education, or other agencies were "tied" by state statutes, the State as a collective entity cannot defend its failure to affirmatively act to eliminate the structure and effects of its past dual system on the basis of restrictive state law. The State executive and its agencies as well as the State's General Assembly had and continue to have the constitutional obligation to affirmatively dismantle any system of de jure segregation, root and branch. This obligation is parallel with the obligation of the KCMSD. This case is before this Court simply because the KCMSD and the State have defaulted in their obligation to uphold the Constitution.

■ Having found that there are still vestiges of the dual school system in the KCMSD, the Court finds the issues in favor of plaintiffs against the KCMSD and the State of Missouri and it further finds the issues in favor of the KCMSD against the State of Missouri. Since these defendants have failed to comply with their constitutional obligations, this Court not only has the power but the duty to enter a decree which will correct the continuing effects of past discrimination as well as bar discrimination against blacks in the future. *Louisiana v. United States,* 380 U.S. 145, 85 S.Ct. 817, 13 L.Ed.2d 709 (1965).

The issues of liability and remedy have previously been bifurcated by this Court. Therefore at this time the Court makes no determination as to what remedy should be decreed nor a determination at this point whether or not the case should be opened for additional discovery and later a trial on the remedy issue. The Court is of the opinion that the initial step which should be taken in regard to remedy would be the preparation and submission of a plan which might obtain the approval of the parties

involved as well as the approval of this Court.

Since the State under its Constitution has the duty to establish and maintain free public schools, it has the primary responsibility for insuring that the public education systems in the State comport with the United States Constitution. The State Board of Education and the KCMSD Board of Education have much more expertise than this Court in the operation and management of public schools within this State. The KCMSD Board more clearly understands the facilities which are available within its system, the extent to which some school facilities are overcrowded while others are not or may even be vacant. It understands the problems of the transportation of students to and from the various school facilities and it more fully understands the administrative problems with which it is faced than this Court does; therefore, the State Board of Education and the KCMSD Board of Education are hereby directed to prepare a plan which would establish a unitary school system within the KCMSD. In doing so, they should concentrate on the schools in which the student enrollment is more than 90% black. They should also, to the extent possible, see that students are permitted to attend a school nearest the student's home so long as by so doing it does not deter from properly integrating the students in the KCMSD. They should also bear in mind cost factors as well as the purpose of the public schools in this state, that is to furnish quality education to its students. While the Court does not intend to limit matters which should be considered to those enumerated above, it does suggest that the above are some considerations which should be kept in mind. It is also the Court's opinion that much of the cost for preparing and implementing a plan to dismantle the vestiges of a dual school system in the KCMSD should be borne by the State. The Court would invite the two Boards to follow the teachings of the United States Supreme Court in regard to appropriate remedies as set forth in *Keyes v. School District No. 1, Denver, Colo., supra; Green v. School Board of New Kent Co., supra;* and *Swann v. Charlotte-Me-*

*chlenburg Bd. of Education, supra.* The Court further directs that such a plan be submitted to the Court within ninety (90) days from the date of this order. Plaintiffs will be given thirty days after the plan is filed in which to file any written objections to it. Upon the submission of such a plan, it may be determined at that time whether or not an additional hearing should be held and evidence received in regard to a remedy.

Accordingly, it is hereby

ORDERED that the Clerk is directed to enter judgment on the issue of liability in favor of HUD and against plaintiffs; in favor of plaintiffs and against the State defendants and the KCMSD; and in favor of the KCMSD and against the State defendants on its cross-claim; and it is further

ORDERED that within ninety (90) days from the date of this order, the State Board of Education and the KCMSD Board of Education are directed to submit a proposed plan which will have the effect of removing the vestiges of the dual school system as it presently exists in the KCMSD; and it is further

ORDERED that plaintiffs shall have thirty (30) days after the proposed plan is filed in which to file objections to it.