# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

—————————

No. 97-1968

—————————

Chinyere Jenkins, by her next friend,   *
Joi Jenkins; Nicholas Paul Winchester-                      *
Rabelier, by his next friend, Paula     *
Winchester; Margo Vaughn-Bey, by her    *
next friend, Franklin Vaughn-Bey;       *
Nicholas C. Light, by his next friend,                      *
Marian Light; Stephon D. Jackson, by    *
his next friend, B. J. Jones; Travis N.                     *
P e t e r ,  by his next friend, Debora Chadd-              *
    Appeals from the United States
P e t e r ;  Leland Guess, by his next friend,             *
    District Court for the
Sharon Guess,                           *    Western District of Missouri.
                                          *

      Plaintiffs - Appellants       *
                                          *

American Federation of Teachers, Local                      *
691,                                    *
                                          *

      Intervenor below - Appellee   *
                                          *

      v.                           *
                                          *

State of Missouri; Mel Carnahan,        *
Governor of the State of Missouri; Bob                      *
Holden, Treasurer of the  State of      *
Missouri; Missouri State Board of       *
Education; Peter Herschend, Member of   *
the Missouri State Board of Education;                      *

Thomas R. Davis, Member of the        *
Missouri State Board of Education;   *
Robert E. Bartman, Commissioner of   *
Education of the State of Missouri; Gary                    *
D. Cunningham, Member of the         *
Missouri State Board of Education; Rice                     *
Pete Burns, Member of the Missouri   *
State Board of Education; Sharon M.       *
Williams, Member of the Missouri State                     *
Board of Education; Betty Preston,   *
Member of the Missouri State Board of   *
Education; Jacquelline Wellington,   *
Member of the Missouri State Board of   *
Education; Russell  Thompson,        *
Member of the Missouri State Board of   *
Education; School District of Kansas    *
City; Dr. Henry D. Williams,         *
Superintendent thereof; Terry M. Riley,                     *
Member of the Board of Directors;    *
Lance Loewenstein, Member of the     *
Board of Directors; Marilyn Simmons,    *
Member of the Board of Directors;    *
Sandy Aguire Mayer, Member of the    *
Board of Directors; John A.  Rios,   *
Member of the Board of  Directors;       *
Darwin Curls, Member of the Board of    *
Directors; Patricia Kurtz, Member of the                    *
Board of Directors; Edward J.        *
Newsome, Member of the Board of      *
Directors; Dr. Julia H. Hill, Member of                     *
the Board of Directors; John W. Still,                      *
Member of the Board of Directors,    *
                                     *
      Defendants - Appellees         *

-2-

_____

No. 97-2078
_____

Chinyere Jenkins, by her next friend,    *
Joi Jenkins; Nicholas Paul Winchester-                         *
Rabelier, by his next friend, Paula      *
Winchester; Margo Vaughn-Bey, by her     *
next friend, Franklin Vaughn-Bey;        *
Nicholas C. Light, by his next friend,                         *
Marian Light; Stephon D. Jackson, by     *
his next friend, B. J. Jones; Travis N.                        *
Peter, by his next friend, Debora Chadd-                       *
Peter; Leland Guess, by his next friend,                       *
Sharon Guess;                            *
                                         *
        Plaintiffs - Appellees           *
                                         *
American Federation of Teachers, Local                         *
691,                                     *
                                         *
        Intervenor below - Appellee      *
                                         *
        v.                               *
                                         *
State of Missouri; Mel Carnahan,         *
Governor of the State of Missouri; Bob                         *
Holden,  Treasurer of the State of       *
Missouri; Missouri State Board of        *
Education; Peter Herschend, Member of    *
the Missouri State Board of Education;                          *
Thomas R. Davis, Member of the           *
Missouri State  Board of Education;      *
Robert E. Bartman, Commissioner of       *
Education of the State of Missouri; Gary                        *
D. Cunningham, Member of the             *

Missouri State Board of Education; Rice                                *
Pete Burns, Member of the Missouri    *
State Board of Education; Sharon M.        *
Williams, Member of the Missouri State                                *
Board of Education; Betty Preston,    *
Member of the Missouri State Board of   *
Education; Jacquelline Wellington,    *
Member of the Missouri State Board of   *
Education; Russell Thompson, Member    *
of the Missouri State Board of        *
Education;                            *
                                      *
     Defendants - Appellants      *
                                      *
School District of Kansas City; Dr.     *
Henry D. Williams, Superintendent    *
thereof; Terry M. Riley, Member of the                                *
Board of Directors; Lance Loewenstein,                                *
Member of the Board of Directors;    *
Marilyn Simmons, Member of the Board    *
of Directors; Sandy Aguire Mayer,    *
Member of the Board of Directors; John                                *
A. Rios, Member of the Board of        *
Directors; Darwin Curls, Member of the                                *
Board of Directors; Patricia Kurtz,      *
Member of the Board of Directors;      *
Edward J. Newsome, Member of the      *
Board of Directors; Dr. Julia H. Hill,                                *
Member of the Board of Directors; John                                *
W. Still, Member of the Board of      *
Directors,                            *
                                      *
     Defendants - Appellees.      *

-4-

Submitted: May 27, 1997
Filed:   August 12, 1997

Before McMILLIAN, HEANEY, and JOHN R. GIBSON, Circuit Judges.

JOHN R. GIBSON, Circuit Judge.

After the Supreme Court's decision in <u>Missouri v. Jenkins</u>, 515 U.S. 70 (1995) (<u>Jenkins III</u>), the State of Missouri filed a motion in this lengthy school desegregation case asking the court to declare the Kansas City, Missouri School District unitary, to dissolve all injunctions, and to relinquish jurisdiction of the case.  Less than a month later, the State and the KCMSD entered into an agreement under which the State would pay the KCMSD a total of $320 million over three years and be released from any further obligation in this desegregation litigation.  The court held a hearing from January 13 through January 31, 1997, receiving testimony from a large number of witnesses and a considerable volume of documentary evidence.  On March 25, 1997, the district court[1] entered its order denying the motion for unitary status in all respects except extra-curricular activities, but approving the agreement between the State and the KCMSD. <u>Jenkins v. Missouri</u>, 959 F. Supp. 1151 (W.D. Mo. 1997).  The Jenkins Class appealed the ruling approving the agreement.[2]  The State appealed the district court's order denying a declaration of unitary status.  We affirm the district court's order.

---

[1]The Honorable Russell G. Clark, Senior Judge, United States District Court for the Western District of Missouri.

[2]The Jenkins Class moved for a stay of the court's order.  We took the motion for stay with the case until we had heard oral argument.  Because we have now decided the case, the motion for stay is moot.

In discussing the State's motion for unitary status, the district court first outlined its earlier orders finding that there had been a system-wide reduction in student achievement in the schools of the KCMSD. 959 F. Supp. at 1153. It looked to its earlier orders identifying the purpose of the public schools as furnishing quality education to their students and identifying educational achievement as a proper goal in a desegregation remedy. Id. (citing Jenkins v. Missouri, 593 F. Supp. 1485, 1506 (W.D. Mo. 1984); Jenkins v. Missouri, 639 F. Supp. 19, 24 (W.D. Mo. 1985), aff'd as modified, 807 F.2d 657 (8th Cir. 1986), cert. denied, 484 U.S. 816 (1987)). The court then briefly reviewed the progress made in the KCMSD. 959 F. Supp. at 1156.

The court determined that the burden of proof was on the State, the adjudged constitutional violator, to show that no vestiges of prior discrimination remained in the KCMSD. Id. at 1156-57. It pointed out that once a court has found an unlawful dual school system, the plaintiffs are entitled to a presumption that existing disparities are causally related to prior segregation, and the burden of proving otherwise rests on defendants. Id. at 1157 (citing Dayton Bd. of Educ. v. Brinkman, 443 U.S. 526, 537 (1979); Keyes v. School Dist. No. 1, 413 U.S. 189, 211 n.17 (1973)). One of the vestiges the court found was an achievement gap between black and white students in the KCMSD. The State argued that the Jenkins Class should bear the burden of proving that this student achievement disparity was caused by the State's constitutional violation. The court rejected the State's arguments, concluding that the achievement gap issue should be governed by the same burden-shifting rules as the other factors, and that the State must prove it did not cause the disparity. Id.

The court analyzed in detail the testimony on this issue, including expert opinions. The court found that a portion of the achievement gap was attributable to de jure segregation and that unitary status had not been attained in this respect. The court ordered the KCMSD to eliminate that portion of the achievement gap within three years. Id. at 1165.

-6-

The court then turned to an analysis of the Green factors.[3] With respect to student assignments or the racial isolation vestige, the court recognized testimony that the KCMSD had realized a high degree of racial balance, but pointed out that the schools lost significant enrollment of white suburban students in the 1995-96 school year following the Jenkins III decision. Id. at 1166. Moreover, the racial imbalance index showed an increase in 1996 for both elementary and secondary schools. Id. The court looked at testimony that the KCMSD must develop and implement a student assignment system focusing exclusively on the pupils residing in the district, and that this could be accomplished within a two- to three-year period. Id. The district court concluded that the KCMSD had not yet achieved unitary status with regard to the racial isolation vestige, but that within a three-year period it would be possible to assess the effects of Jenkins III on minority enrollment. Id. at 1167.

With respect to faculty and staff assignments, the district court recounted the testimony that the district had maintained a substantial degree of racial balance in faculty assignments. Id. at 1166. However, the court also recognized testimony that, during recent years, while the secondary schools fell within the desired variance level, the elementary schools had shown a steady decline in compliance. Id. at 1166. The court held that the steady decline at the elementary school level of a balanced faculty warranted further investigation, and so "the court [found] that the KCMSD has not yet achieved unitary status as to faculty assignments." Id. at 1168. However, the court also stated that the KCMSD should be able to remedy this defect in a period of three years. Id.

---

[3]In Green v. County School Board, 391 U.S. 430, 435 (1968), the Supreme Court stated that school districts were obliged to desegregate all aspects of their school systems, including: student assignments, faculty and staff assignments, transportation, facilities, and extra-curricular activities. Disparities in these five aspects of a school's operations are the most important indicia of a segregated school system. See Jenkins III, 515 U.S. at 88.

With respect to the facilities of the KCMSD, the court observed that the capital improvements already ordered were almost, but not entirely, completed. The court held that declaration of unitary status should be withheld until the ordered improvements were completed, which would certainly be accomplished in less than three years.  Id. at 1168.

The court held that transportation was so closely related to the racial isolation vestige that it was not advisable to relinquish jurisdiction over the transportation aspect until the KCMSD was unitary in student assignments.  The court therefore declined to find the State had carried its burden of proof on the transportation vestige.  Id.

As to the State's motion for unitary status regarding extra-curricular activities, the court held that the State has carried its burden of proving the KCMSD unitary in this respect.  The adverse parties seem to agree on this issue.  Id.  The court rejected the State's argument in all other respects.

The court then considered whether to approve the agreement between the State and the KCMSD releasing the State from liability upon the payment of $314 million (plus an additional $6 million added by the court after the agreement was entered).  Id. at 1152.  The court looked at various figures reflecting the spending level in the KCMSD per pupil as compared with the other largest school districts in the United States.  Id. at 1170.  It recited the testimony of Dr. John Murphy that the transition funding provided under the agreement would be sufficient to allow a systematic and orderly transition period during which the KCMSD could become self-sufficient.  It looked to Dr. Murphy's testimony that if the agreement were approved, the KCMSD would have sufficient funds not only to offer quality education, but to make the curriculum and other reforms necessary to improve student achievement.  Id.  The court also looked at testimony concerning the possibilities of  the KCMSD achieving other savings, such as reduced transportation expenditures.  The fact that much of the capital improvement program had been paid for out of current revenue, rather than debt,

created a situation in which the district would have to pay little for debt service in future years. Id. at 1171. The court also considered that the racial isolation vestige could be rectified in two years, and that many of the goals of the quality education programs had been reached. Id. at 1171-72.

The district court rejected arguments of the Jenkins Class that the court had no authority or jurisdiction to approve the agreement. Id. at 1172. The district court concluded that, considering the KCMSD's proximity to unitary status, any remaining obligation of the State to the KCMSD school children would be discharged by the payment of the funds provided in the agreement. It observed that the State has been responsible for the funding, and not the implementation, of the desegregation programs. The court therefore modified the joint and several liability finding to make the KCMSD liable individually. The court decreed that the State's obligation shall end and the State will be entitled to an order from the court dismissing it from the action when it has paid the sums provided for in the agreement. Id.

While the court had released the State from further obligations, except for the payment of funds, it suggested that Dr. Robert Bartman of the Department of Elementary and Secondary Education of Missouri had the educational expertise and familiarity with the history of the KCMSD desegregation effort to provide guidance during the transition period, and that the Department should give approval before decisions are made about the necessary budget cuts. Id. at 1178. This was made as an appeal to the Department and Dr. Bartman's sense of duty. The court concluded that if the Department and Dr. Bartman declined the court's appeal, then the court would seek the Department's help in finding a special master to oversee the KCMSD. Id. at 1179. We are informed that the Department and Dr. Bartman have declined this invitation. The issue, however, remains before the district court, and while the district judge presiding over this case for many years has turned over superintendence of the

case to another judge,[4] we are satisfied that the urgency of timely disposition of further supervision over the district will be promptly considered.

## I.

The State argues that it is entitled to a declaration that the KCMSD has achieved unitary status. Interestingly, the KCMSD, as well as the Jenkins Class, defend the district court's holding that the KCMSD is not unitary. The threshold issue is whether the State or the Jenkins Class bears the burden of proof on this issue.

Generally, once there has been a finding that a defendant established an unlawful dual school system in the past, there is a presumption that current disparities are the result of the defendant's unconstitutional conduct. See Keyes v. School Dist. No. 1, 413 U.S. 189, 208-09 (1973); Dayton Bd. of Educ. v. Brinkman, 443 U.S. 526, 537-38 (1979); Freeman v. Pitts, 503 U.S. 467, 494 (1992); see also United States v. Fordice, 505 U.S. 717, 744 (1992) (O'Connor, J., concurring). Only when a school district has attained unitary status does the burden of proving disparities were caused by intentional segregation shift back to the plaintiffs. See School Bd. v. Baliles, 829 F.2d 1308, 1311 (4th Cir. 1987); see also Oliver v. Kalamazoo Bd. of Educ., 640 F.2d 782, 810 (6th Cir. 1980) (error in assigning burden of proof to defendants where defendants' liability under earlier decree "had been satisfied").[5] If, however, a defendant is joined after the finding of liability, that defendant is, naturally, not subject to the presumption applied to adjudicated constitutional violators. See United States v. City of Yonkers, 833 F.

---

[4]The Honorable Dean Whipple, United States District Judge for the Western District of Missouri.

[5]In Kalamazoo Board of Education, 640 F.2d at 808-09, another reason for putting the burden of proof on plaintiffs was that they were seeking additional relief, whereas the original decree stated that any party seeking to modify the decree would bear the burden of "justifying changes."

Supp. 214, 220 (S.D.N.Y. 1993) (shifting burden to new defendant would be "problematic").

The State contends that the general rule of presuming causation applies to disparities of the sort mentioned in Green, 391 U.S. at 435, but not to disparities in student achievement. The State contends this distinction is appropriate because the defendants have control over the Green factors, such as student assignment, equality of facilities, and transportation, whereas the defendants do not have control over student achievement. The State argues that too many external factors affect student achievement to require the State to prove that it did not cause low minority achievement.

This argument is not persuasive. As the Supreme Court noted in Jenkins III, the Green factors can also be affected by forces outside the defendants' control:

> Just as demographic changes independent of de jure segregation will affect the racial composition of student assignments, so too will numerous external factors beyond the control of the KCMSD and the State affect minority student achievement.

515 U.S. at 102 (citation omitted). The task of the court in analyzing either type of disparity is to determine whether it was caused by defendants' misconduct or by external factors. The burden of proof rules are simply the framework for making that inquiry.

There is, nevertheless, a meaningful distinction between the Green factors and the student achievement factor. Disparities in the Green factors, such as student assignment, inherently define a dual school system, which could not exist without such disparities. See Coalition to Save Our Children v. State Bd. of Educ., 90 F.3d 752, 776 (3d Cir. 1996) (Green factors are per se vestiges of de jure segregation). On the other

-11-

hand, disparity or impairment in student achievement may or may not be found in a particular case and may or may not be the result of a segregated or dual system. For this reason, the presumption of causation will only be applied to student achievement disparities if the court has already specifically found that student achievement in the district has suffered as a result of the dual system. Thus, in Coalition to Save Our Children, the district court had not included disparity in student achievement as a subject for ancillary (i.e., non-Green) relief in its remedial decree. When the defendants later moved for a declaration of unitary status, the Third Circuit held that the plaintiffs had the burden of proving that disparities in student achievement were vestiges of de jure segregation. Id. at 776-77. Accord City of Yonkers, 833 F. Supp. at 222 n.3 (no initial finding that segregation caused reduction in student achievement; plaintiffs bear burden of showing causation).

In the early days of this case, the district court specifically found impairment in student achievement in the KCMSD was a result of the dual school system. In 1984 the district court found:

> The Court finds the inferior education indigenous of the state-compelled dual school system has lingering effects in the Kansas City, Missouri School District.

593 F. Supp. at 1492. Again, in 1985, the District Court found:

> Segregation has caused a system wide reduction in student achievement in the schools of the KCMSD . . . .
>
> . . . .
>
> . . . [The] education process has been further "bogged down" in the KCMSD by a history of segregated education. Too often, as a result, a higher percentage of black students are among the lower achievers.

639 F. Supp. at 24, 28.  Therefore, the Jenkins Class was entitled to a presumption that current deficiencies in student achievement were a continuation of the vestige already identified.  See Baliles, 829 F.2d at 1311-12 (rejecting argument that presumption of causation only applies to Green factors, not to student achievement).  But see People Who Care v. Rockford Bd. of Educ., No. 89 C 20168, 1996 WL 364802 at *73 n.146 (N.D. Ill. June 7, 1996) (presumption of causation not applicable to achievement disparity), aff'd in part and rev'd on other grounds, 111 F.3d 528, 537-38 (7th Cir. 1997)  (in light of lack of evidence about proportion of achievement gap caused by defendants, district court erred in ordering defendants to close 50% of gap).

The State contends that in Jenkins III the Supreme Court held the district court's findings of student achievement vestiges in the KCMSD were inadequate and therefore ineffective to shift the burden of proof to the State.  In fact, the Supreme Court did not  say the district court's student achievement findings were insufficient to establish liability for the student achievement vestige.  To the contrary, the Court specifically contemplated that the reduction in student achievement must be remedied:

> Thus, the proper response by the District Court should have been to eliminate to the extent practicable the vestiges of prior de jure segregation within the KCMSD: a system-wide reduction in student achievement and the existence of 25 racially identifiable schools. . . .

515 U.S. at 90.  As the State points out, the Court observed that the district court had never made findings on the severity of the vestige, or the "incremental effect that segregation has had on minority student achievement or the specific goals of the quality education programs."  Id. at 101.  The Court made this observation in the context of discussing what measure of improvement should be required to establish unitariness.  In the same paragraph the Court stated:  "Under our precedents, the State and the KCMSD are entitled to a rather precise statement of [their] obligations under a desegregation decree."  Id. (quotation omitted).  The Court did not question the

-13-

existence of the achievement vestige; instead, it ordered that the district court clarify the quantum of the student achievement vestige, so that the parties could know what mark they and the court were aiming at. But see id. at 118 (Thomas, J., concurring) (questioning validity of 1984 finding). In the order we review today, the district court complied faithfully with the Supreme Court's command to quantify the vestige.

The State also argues that the passage of time since the days of state-mandated segregation makes it inappropriate to presume that current conditions resulted from that segregation. Justice Scalia's concurrence in Freeman suggested that the passage of time renders the presumption of causation inappropriate. See 503 U.S. at 506 (Scalia, J., concurring) ("[T]he rational basis for the extraordinary presumption of causation simply must dissipate as the de jure system and the school boards who produced it recede further into the past."). However, the majority opinion in Freeman continued to recognize the presumption. The majority opinion acknowledged that the passage of time does have some probative value, tending to strengthen a defendant's case that de jure segregation did not cause current disparities. The majority stated:

> As the de jure violation becomes more remote in time and these demographic changes intervene, it becomes less likely that a current racial imbalance in a school district is a vestige of the prior de jure system. . . . In light of its finding that the demographic changes in DeKalb County are unrelated to the prior violation, the District Court was correct to entertain the suggestion that DCSS had no duty to achieve system-wide racial balance in the student population.

Id. at 496. At the same time, the Freeman majority reiterated: "The school district bears the burden of showing that any current imbalance is not traceable, in a proximate way, to the prior violation." Id. at 494. Keyes specifically rejected the idea that the passage of time could cause the burden to shift back to the plaintiffs: "[C]ertainly plaintiffs in a school desegregation case are not required to prove 'cause' in the sense

-14-

of 'non-attenuation.'"  413 U.S. at 211 n.17. Therefore, we conclude that the passage of time[6] is an evidentiary consideration, but not a bar to the usual burden-shifting rules.

The State also argues that the presumption of invidious causation should not be applied to the State because the State's obligation has only been to pay for the remedy, not to implement it.  We deal with this argument infra at pages 16-18.

## II.

Jenkins III reiterated the standard for determining whether a school district has become unitary:

> [A]mong the factors which must inform the sound discretion of the court in ordering partial withdrawal are the following:  [1] whether there has been full and satisfactory compliance with the decree in those aspects of the system where supervision is to be withdrawn; [2] whether retention of judicial control is necessary or practicable to achieve compliance with the decree in other facets of the school system; and [3] whether the school district has demonstrated, to the public and to the parents and students of the once disfavored race, its good-faith commitment to the whole of the court's decree and to those provisions of the

---

[6]The passage of time is often overstated by reference to the time of the de jure violations or the duration of this suit.  It is frequently overlooked that the obligation of the KCMSD and the State to eliminate the vestiges of the de jure dual school system was not seriously undertaken until after the affirmance by this court in Jenkins v. Missouri, 855 F.2d 1295 (8th Cir. 1988), cert. denied in part, 490 U.S. 1034 (1989), aff'd in part and rev'd in part, 495 U.S. 33 (1990), of the intradistrict remedies crafted by the district court.  Thus, it was not until the late 1980's that implementation of the remedies was commenced, and it was in the early 1990's that the effort was well under way.

law and the Constitution that were the predicate for judicial intervention in the first instance.  [Freeman v. Pitts,] 503 U.S., at 491.

The ultimate inquiry is whether the [constitutional violator] ha[s] complied in good faith with the desegregation decree since it was entered, and whether the vestiges of past discrimination ha[ve] been eliminated to the extent practicable.

515 U.S. at 89 (quotation omitted).

The Court of Appeals reviews the district court's findings as to the existence of vestiges of segregation under the "clearly erroneous" standard.  See Lockett v. Board of Educ., 111 F.3d 839, 841-42 (11th Cir. 1997) (per curiam); Coalition to Save Our Children, 90 F.3d at 760; Flax v. Potts, 915 F.2d 155, 157 (5th Cir. 1990).

The difficult issue before the district court and before us in this appeal is whether the vestiges of past discrimination have been eliminated to the extent practicable.  Before we reach this issue, we will briefly comment on whether there has been full and satisfactory compliance with the decree in those aspects where supervision is to be withdrawn, and whether the State has demonstrated to the public, the parents, and the students of the once disfavored race a good faith commitment to the whole of the court decree.

The Supreme Court observed that the State's role with respect to quality education programs has been limited to funding, not implementation, of these programs.  Jenkins III, 515 U.S. at 101.  The district court recognized the Supreme Court's  language in its opinion.  959 F. Supp. at 1172.  With the passage of time this has been the nature of the State's compliance.  It should be remarked, however, that in the early days of crafting  the intra-district remedy, the Jenkins Class, the KCMSD, and the State were called upon to submit proposed remedial plans, and did so.  The early orders of

the district court accepted the plans put forth by the Jenkins Class and the KCMSD, and rejected the State's proposals as inadequate. See, e.g., Jenkins v. Missouri, 672 F. Supp. 400, 404 (W.D. Mo. 1987), aff'd in relevant part, 855 F.2d 1295 (8th Cir. 1988), cert. denied in relevant part, 490 U.S. 1034 (1989). Perhaps this established a pattern of either the Jenkins Class or the KCMSD assuming responsibility for proposing remedial measures, and the State relying upon legal objections to the plan and ultimately ceasing any effort to make a contribution toward directing or administering the aspects of the remedy. The State had an opportunity to help shape the remedy, and perhaps the long history of this litigation would have been different had it accepted the challenge to do more than pay when ordered to do so. Nevertheless, this pattern having been established, the State has undoubtedly complied with the decrees of the district court by funding the programs that have been ordered.

The State places great emphasis on the amount of money that has been spent in Kansas City. It must be remembered in looking back on the long history of this case, however, that the district court found and this court affirmed findings that the physical plant of the KCMSD had literally rotted; that the inferior education indigenous of the state-compelled dual school system has lingering effects in the Kansas City, Missouri School District; that the general attitude of inferiority among blacks produces low achievement which ultimately limits employment opportunities and causes poverty; and finally, that segregation has caused a system-wide reduction in student achievement in the schools of the KCMSD. See Jenkins v. Missouri, 855 F.2d at 1300 (citing district court decisions at 593 F. Supp. at 1492, 639 F. Supp. at 24, and 672 F. Supp. at 411).

Restoration of the physical facilities has had a total cost of approximately $500 million, with funds contributed roughly equally by the State and the KCMSD. With respect to educational and other programs, the State has spent approximately $950 million, and the KCMSD has spent about $350 million. The extensive constitutional violations have required extensive expenditures.

Suffice it to say that we are left with some question in our minds as to whether the State has demonstrated a "good-faith commitment to the whole of the court's decree and to those provisions of the law and the Constitution that were the predicate for judicial intervention in the first instance." Freeman, 503 U.S. at 491. Justice Souter, in his dissent in Jenkins III, questioned the State's commitment to complying with the district court's decree. He quoted the district court's statement that "during the course of this lawsuit the Court has not been informed of one affirmative act voluntarily taken by the Executive Department of the State of Missouri or the Missouri General Assembly to aid a school district that is involved in a desegregation program." 515 U.S. at 152 (Souter, J., dissenting) (quoting District Court's Order of Nov. 12, 1986, slip op. at 7). Justice Souter also quoted the following statement of the district court: "The State, also a constitutional violator, has historically opposed the implementation of any program offered to desegregate the KCMSD. . . . [T]he State has never offered the Court a viable, even tenable, alternative and has been extremely antagonistic in its approach to effecting the desegregation of the KCMSD." Id. (quoting District Court's Order of April 16, 1993, slip op. at 2). In view of our analysis of whether the vestiges of segregation have been remedied to the extent practicable, we need not further examine this issue.

**III.**

We now turn to the issue that the Supreme Court stated was the basic task of the district court, namely deciding whether reduction in achievement by minority students attributable to prior de jure segregation has been remedied to the extent practicable. In Jenkins III the Supreme Court said:

> Under our precedents, the State and the KCMSD are "entitled to a rather precise statement of [their] obligations under a desegregation decree." [Freeman, 498 U.S.] at 246. Although the District Court has determined that "[s]egregation has caused a system wide reduction in achievement in

-18-

the schools of the KCMSD," 639 F. Supp., at 24, it never has identified the incremental effect that segregation has had on minority student achievement or the specific goals of the quality education programs.

515 U.S. at 101.

In the order now before us, the district court directed its attention to identifying the incremental effect that segregation has had on minority student achievement, and also to specifying the goals of the quality educational programs. It should first be said that the district court in its order of September 17, 1984, pointed to evidence in the record before it in stating:

> The general attitude of inferiority among blacks produces low achievement which ultimately limits employment opportunities and causes poverty. . . . The District stipulated that as of 1977 they had not eliminated all the vestiges of the prior dual system. The Court finds the inferior education indigenous of the state-compelled dual school system has lingering effects in the Kansas City, Missouri School District.

593 F. Supp. at 1492 (citations omitted).

The court pointed out further that various plans adopted by the KCMSD in an effort to reduce minority isolation had not been effective. The court stated:

> During the 1983-84 year, no school had less than 30% black enrollment; 24 schools however are racially isolated with 90 + % black enrollment. The Court finds the District did not and has not entirely dismantled the dual school system. Vestiges of that dual system still remain.

Id. at 1493 (citations omitted).

The court also stated that because most of the schools were in racially segregated neighborhoods before 1954, the adoption of the neighborhood school concept did not substantially change the segregated school system. Id. Optional attendance zones adopted after Brown v. Board of Education, 349 U.S. 294 (1955), did not aid the district's integration, but on the contrary allowed segregated attendance patterns to continue. 593 F. Supp. at 1494.

There is a significant relationship between the testimony the court pointed to in 1984 and the testimony presented at the hearing in January 1997 by the expert witnesses.

The State's expert witness, Dr. David Armor, testified that in analyzing test scores of black and white students in the KCMSD, using a bell curve with a median score of 50 normalized curve equivalent (NCEs), whites scored about ten NCEs higher than blacks. Armor testified that "most, if not virtually all" of this achievement gap in the Kansas City, Missouri School District was the result of socio-economic conditions. However, Dr. Armor could only identify socio-economic conditions accounting for about two-thirds of the gap; the other third remained unexplained. 959 F. Supp. at 1163.

On the other hand, the expert produced by the KCMSD, Dr. William Trent, testified that after controlling for poverty, family background, and other factors, there was still a "race effect" that could be due to past segregation. Id. at 1158. The gap existed in 1986 and 1988, continues to exist now, and has never been eliminated. Dr. Trent concluded that about 4% to 9% of the achievement gap was explained by race. Id. Significantly, the State's expert, Dr. Armor, testified that the size of the achievement gap grows larger the longer the children remain in school. Id. at 1159. Moreover, Dr. Trent testified that teachers' low expectations of achievement in schools with high percentages of minority students also contribute to the achievement gap. Id.

After setting out the substance of the testimony of these expert witnesses, the district court pointed out that the State's reliance on socio-economic factors was inadequate to explain about 35% of the gap, even taking the State's expert at his word. Id. at 1163. The court found that Dr. Trent's analysis showing a "race effect" explaining 4-9% of the gap was "reliable and accurately identifies the incremental portion attributable to the prior de jure discrimination." Id. The court found that the teacher expectation variable explains 2-4% of the gap, id., and that the teachers' lower expectations were a result of earlier de jure segregation. Id. at 1164. The court took the high end of these ranges in reaching the figure of 13%. The court also held that the increase in the gap as the children progressed through the KCMSD could also be attributed to discrimination, id. at 1165, and this, together with the gap when the students entered school, was 26% of the achievement gap. The court concluded that these figures translated into a mandate to the school district to reduce the achievement gap by 2.6 NCEs. The court ordered that this task was to be completed within three years. It concluded that KCMSD has not currently attained unitary status regarding the quality of education. Id.

It is evident that the district court rejected Dr. Armor's opinion that socio-economic factors alone were the cause of the achievement gap in the KCMSD. We cannot say that the district court clearly erred in making this finding. The burden of proof was on the State to prove that it had not caused the gap, and the State's expert could not explain a third of the achievement gap by his socio-economic theory. The State simply failed to carry its burden, and our discussion could end at this point. But in addition, the district court accepted Dr. Trent's explanation quantifying that part of the achievement gap resulting from race; that was a finding of fact based upon research by a well-qualified expert.[7]  Dr. Trent's testimony provided a rational explanation for

---

[7]The State briefly suggests that Dr. Trent's testimony did not "rise to the level of evidence" contemplated by Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993). The State does not cite any reference to the record at which it objected to the evidence under Daubert. We therefore understand the State's argument to be a substantive argument about sufficiency of the evidence, rather than an evidentiary objection.

the achievement gap and the extent of it, and we cannot conclude that the district court erred in so finding.[8]

## IV.

The State attacks the district court's denial of unitariness status as to four of the five <u>Green</u> factors--student assignments, faculty and staff assignments, transportation, and facilities.

The KCMSD contended that the current racial balance within its schools was unknown because of the effect of the withdrawal of suburban students after <u>Jenkins III</u>. The district court observed that the student assignment aspect of the remedy in this case had depended primarily on voluntary transfers from the suburbs in conjunction with magnet schools, rather than on mandatory reassignment. <u>Id.</u> at 1166. After <u>Jenkins III</u>, many suburban students left the KCMSD. The district court found that the "ramifications of the withdrawal of the 1476 white students cannot be judged at this time." <u>Id.</u> at 1167. The court declined to declare the KCMSD unitary in this regard until the effects of this change in the enrollment could be ascertained. Therefore, the State failed to carry its burden of proof that there was no student assignment vestige. The State contends that, whatever the student assignment statistics, the KCMSD is not currently engaging in discriminatory student assignment practices, and therefore there should be no vestige under <u>Pasadena City Board of Education v. Spangler</u>, 427 U.S. 424 (1976).

---

[8]The expert testimony was responsive to the Supreme Court's direction to quantify the achievement gap. It was the only testimony to address this issue, and came from all parties.

Under Spangler and Freeman, school districts that have once eliminated the student assignment vestige are not required to readjust student assignments to compensate for subsequent imbalances caused by forces other than intentional segregation. "Once the racial imbalance due to the de jure violation has been remedied, the school district is under no duty to remedy imbalance that is caused by demographic factors." Freeman, 503 U.S. at 494. The key distinction between this case, on the one hand, and Spangler and Freeman, on the other, is that there is no finding in this case that the KCMSD ever eliminated the student assignment vestige. The district court's strategy for eliminating this vestige was the magnet school program, rather than the sort of unilateral reassignment decree used in Spangler. See 427 U.S. at 435-36. This strategy was at least partly aborted by the Jenkins III ruling, and the district court found that, on the present state of the record, it was impossible to assess the racial balance in the schools during the process of dismantling the original remedy. This finding was not clearly erroneous. Accordingly, the State's invocation of Spangler and Freeman on this point is premature. See Vaughns v. Board of Educ., 758 F.2d 983, 988 (4th Cir. 1985) ("Until a unitary system is created, a school system is not absolved from this duty by reason of demographic changes."); Haycraft v. Board of Educ., 560 F.2d 755, 756 (6th Cir. 1977) (Spangler not relevant where segregation has never been remedied).

The district court found that the transportation factor was so closely bound to student assignment that the uncertainty affecting the student assignment vestige also prevented a finding of unitariness as to transportation. 959 F. Supp. at 1168. In Freeman the Supreme Court foresaw the possibility of such intertwining. "Two or more Green factors may be intertwined or synergistic in their relation, so that a constitutional violation in one area cannot be eliminated unless the judicial remedy addresses other matters as well." 503 U.S. at 497. There is no clear error in the district court's finding.

As to the facilities factor, the district court found that certain court-ordered renovations remain to be completed. 959 F. Supp. at 1168. The district court did not

-23-

err in requiring the terms of the court's decree to be completely fulfilled before relinquishing the ability to enforce compliance with the decree.

In considering the faculty and staff assignments factor, the district court relied on the testimony of the State's witness Dr. Armor, who testified that, while the KCMSD had once complied with the court's orders to bring about racial balance in faculty and staff assignments, the percentage of elementary schools complying with the balance guidelines had "decreased steadily" in recent years. Id. at 1168. The court also concluded that it was necessary for the court to retain control over faculty appointments in order to maintain flexibility in other areas, such as reducing expenditures. Id. Under Freeman, the district court retains discretion to determine whether to relinquish jurisdiction on a piecemeal basis. See 503 U.S. at 493. Where the district court has reason to retain supervision over an area to aid its jurisdiction over unfinished business, Freeman certainly does not require the court to declare partial unitariness. See id. at 497-98.

We thus conclude that the district court did not err in finding that the achievement gap vestige had not been remedied to the extent practicable, and that four out of the five Green factors had not been remedied. Thus, the KCMSD could not be held unitary in any aspect other than extra-curricular activities.

**V.**

The Jenkins Class appeals the district court's approval of the agreement between the State and the KCMSD. Pursuant to the agreement, the State will be dismissed from this litigation after it pays the KCMSD approximately $320 million over three fiscal years to implement desegregation remedies in the district.

-24-

The Jenkins Class contends that we review the district court's approval of the agreement de novo. The State contends that the district court had discretion to modify its earlier remedial orders based on changed conditions, and that we review such a modification only under an abuse of discretion standard. The KCMSD argues that the district court has broad discretion to determine the scope of its remedy.

There is no single blueprint or universal answer for desegregation cases, see Milliken v. Bradley, 433 U.S. 267, 287 (1977), and "there is obviously no one plan that will do the job in every case." See Green, 391 U.S. at 439. Instead, the district court, which has "firsthand experience with the parties and is best qualified to deal with the 'flinty, intractable realities of day-to-day implementation of constitutional commands,'" has broad and flexible equitable powers to fashion desegregation remedies. United States v. Paradise, 480 U.S. 149, 184 (1987) (quoting Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 6 (1971)). "Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." Swann, 402 U.S. at 15; see also Little Rock Sch. Dist. v. Pulaski County Special Sch. Dist., 839 F.2d 1296, 1314 (8th Cir.) (the district court has "broad remedial authority in dismantling segregation"), cert. denied, 488 U.S. 869 (1988). Because the district court possesses such broad discretion, "[o]ur standard of review of the district court's actions . . . is restricted." Jenkins, 855 F.2d at 1299. We must "give great deference to a district court's exercise of its broad equitable powers in crafting a remedy in school desegregation cases." Jenkins v. Missouri, 965 F.2d 654, 656 (8th Cir. 1992).

The district court retains this broad equitable authority throughout the entire desegregation case to modify the remedy as it deems necessary. Indeed, the district court has often done so during the long life of this case, and we have affirmed such modifications. The court has "inherent capacity to adjust remedies in a feasible and

-25-

practical way to eliminate" the unconstitutional conditions.  Freeman, 503 U.S. at 487, 489 (holding that the district court had discretion "to order an incremental or partial withdrawal of its supervision and control").  In an earlier Jenkins opinion, we described the district court's broad and continuing equitable authority:

> [A] federal court has "inherent jurisdiction in the exercise of its equitable discretion and subject to appropriate appellate review to vacate or modify its injunctions." Booker v. Special School Dist. No. 1, 585 F.2d 347, 352 (8th Cir. 1978), cert. denied, 443 U.S. 915 (1979).  School desegregation plans are particularly likely to need adjustment.  As the Supreme Court has observed regarding such cases: "[E]quity has been characterized by a practical flexibility in shaping its remedies and by a facility for adjusting and reconciling public and private needs." Milliken [v. Bradley, 433 U.S. 267, 288 (1977)] (quoting Brown v. Board of Educ., 349 U.S. 294, 300 (1955)). . . .

> We have said that the basic responsibility for determining whether and to what extent an injunction should be modified "rests primarily on the shoulders of the district court that issued the injunction in the first place." Booker, 585 F.2d at 353.

Jenkins v. Missouri, 931 F.2d 470, 482 (8th Cir.), cert. denied, 502 U.S. 967 (1991).

Thus, our review of the district court's order approving the agreement is limited, and we may reverse that order only if we conclude that it was an abuse of the court's discretion.  See, e.g., Swann, 402 U.S. at 31 (court must affirm desegregation order if it is reasonable, feasible, and workable).  To the extent that the court based its order on findings of fact, those findings "may not be disturbed unless clearly erroneous." Jenkins, 855 F.2d at 1300.  With these standards in mind, we now consider the merits of the agreement.

**B.**

Certain aspects of the agreement, and its intended effect, are greatly troubling to us. The two constitutional violators, the State and the KCMSD, have agreed to release one of the violators, the State, from any further duty to the constitutional victims beyond the duty to pay the specified sums of money. The constitutional victims are not a party to this agreement. We must bear in mind, however, the Supreme Court's directive in Jenkins III that the district court "should consider that the State's role with respect to the quality education programs has been limited to the funding, not the implementation, of those programs." 515 U.S. at 101. The Court also reaffirmed the district court's ability to declare partial unitary status and permit the violator's partial withdrawal in phases. See id. at 88, 101. With the Supreme Court's directives in mind, we will now turn to the considerations supporting approval of the agreement.

The basic foundation for the district court's approval of the agreement is its assumption that the KCMSD will be unitary within two to three years. As set forth in parts III and IV of this opinion, we affirm the court's findings regarding unitary status both as to educational achievement and as to the Green factors.

The court properly recognized that the Supreme Court's standard for unitary status does not require total elimination of the vestiges of discrimination, including the achievement gap, but focuses on whether those vestiges have "been eliminated to the extent practicable." Id. at 89 (quoting Freeman, 503 U.S. at 492). Perhaps the district judge who has lived with this case for nearly twenty years was making an optimistic prediction about the KCMSD's progress toward desegregation in the next two to three years. On the other hand, however, we must affirm if the district court's findings support its conclusion that a period of two to three years will allow the remaining vestiges to be eliminated to the extent practicable.

The district court relied primarily on the testimony of Dr. John Murphy, a former school superintendent for both the Prince George's County, Maryland district and the Charlotte-Mecklenburg district in North Carolina, as well as other districts. Both Prince George's County and Charlotte-Mecklenburg were subject to court desegregation orders during Dr. Murphy's tenure. Dr. Murphy was asked to develop a transition plan to focus on improving the quality of learning in the KCMSD with the understanding that there would be a significant reduction in expenditures over three years. He expressed the opinion this could be done. Dr. Murphy testified that the agreement would provide the KCMSD with approximately $6,000 per pupil per year, an amount which would be sufficient not only to offer a quality education, but also to make the curriculum and other reforms necessary to improve student achievement. There was evidence in the record that Dr. Murphy had achieved similar goals in Prince George's County while spending $5,405 per pupil. While it may be true that Dr. Murphy's testimony dealt with one-third of the district he supervised in the 1992-93 school year and with costs for a different time and locality, the weight of his testimony was to be assessed by the district court. His testimony was clear that the level of funding provided by the agreement would be sufficient to implement the strategies and improvements that he believed were necessary in the KCMSD, similar to those in Charlotte-Mecklenburg or Prince George's County. The phase-out over a three-year period was critical to Dr. Murphy, and he testified that a gradual reduction in funding would allow district administration and staff to do a better job, even while resources were being tightened.

Dr. Michael Stolee, an experienced educator and former director of the Florida School Desegregation Consulting Center, provided evidence regarding student assignments. He testified that the KCMSD could be reorganized within a two-year period at a cost paid by anticipated revenues in a manner to eliminate racial isolation to the extent practicable.

The district court ordered the KCMSD to reduce the achievement gap by 2.6 NCEs within three years. 959 F. Supp. at 1179. Although the court was unable to say with absolute certainty that the KCMSD will have attained unitary status within the next three years, the court nevertheless concluded that the three-year period was a reasonable time frame for the KCMSD to accomplish its task. Id. The court noted that some witnesses had testified that two to three years was sufficient to eliminate some of the remaining vestiges, while other witnesses had testified that three to five years would be required. Id. It concluded that three years should be sufficient. Id. The court did not find that the remaining vestiges can be eliminated to the extent practicable within this period, but rather expressed a judgment as to the extent of the State's remaining obligation, which was based on the testimony before it. We cannot conclude that the district court erred or abused its discretion in this regard.

With respect to the remaining Green factors, as we noted above, the district court made factual findings that unitariness could be accomplished in these areas within two to three years. We have reviewed the record as a whole and conclude that these findings are not clearly erroneous. To the extent there are conflicts in the evidence, resolution of such conflicts is for the district court.

In light of the evidence before the district court, we cannot hold its findings to be clearly erroneous or its conclusion to be an abuse of discretion. We confess that if we were the trier of fact, we would not have reached this result with respect to the achievement gap. Our duty, however, is to review the district court's findings for clear error, rather than to make our own findings, and we do not find a basis for reversal under this standard.

### C.

It is also significant that the time frame for terminating state funding contemplated by the agreement is similar to that envisioned by the district court several

years ago.  In 1993, the court called upon the parties to submit plans for terminating funding based on assumptions that the termination would occur in three, five, seven, or ten years.  See District Court's Order of April 16, 1993, slip op. at 21.  The longer periods would terminate funding in either 2000 or 2003.  The agreement provides for State payments over three years, which the KCMSD has agreed to spend over five years, thus providing funding until the year 2001 or 2002.  Therefore, there is only a small difference between the timing of terminating State funding under the agreement and the time frame previously contemplated by the district court.  Resolving issues such as extent and degree is a core function of the district court, and it has considerable discretion in this task.  We cannot conclude that the district court abused its discretion in approving this period for the phase-out of the State's funding obligation.

**D.**

We have described the State's role in implementing desegregation remedies in this case as being limited to only providing funding.  This issue merits further discussion.[9]

Certainly, the Missouri Constitution imposes broader responsibilities upon the State than simply providing financing.  It provides that the General Assembly shall establish and maintain free public schools for the instruction of all children in the State, and that the supervision of instruction in the public schools shall be vested in a state board of education.  Mo. Const. art. IX, §§ 1(a), 2(a).

The State bore a duty under the federal Constitution to eliminate the dual school system created by law, which indeed it has done, but its duty did not end there.  The

---

[9]We must first pause to say that the State's funding-only role has come about through the  State's conscious policy choices to so limit its involvement.  We do not believe that either state or federal law contemplated such a limited role for the State.

State was further required to eliminate the vestiges of such system to the extent practicable, a far broader responsibility. Despite this constitutional responsibility, however, the State's only action besides funding has essentially been limited to repeatedly objecting to the remedy proposals submitted by both the Jenkins Class and the KCMSD, as shown by a perusal of this court's opinions.

Thus, the State's role in this protracted litigation has evolved into one of funding only. The agreement essentially acknowledges the present state of affairs, and the KCMSD, by entering into the agreement, has expressed its acceptance of this limited role.[10]

Funding for the KCMSD is unquestionably critical to the continuing success of the district's programs. Indeed, the present level of funding, on which the continuing operation of the schools is dependent, exists only because of the district court's authority to enjoin enforcement of state laws that bar the KCMSD from establishing a levy sufficient to operate the schools. See Missouri v. Jenkins, 495 U.S. 33, 52 (1990). We also note that the Missouri General Assembly, in its most recent session, passed a house joint resolution submitting for state-wide voter consideration a constitutional amendment to allow the KCMSD to maintain the levy at its present level with district voter approval, thereby providing a means for continued financial support of the KCMSD independent of court order after the KCMSD is no longer under court supervision. See 1997 Mo. Legis. Serv. H.J.R. No. 9 (Vernon's).

Sufficient funding is absolutely essential to the school district's continued viability. All parties agree that the loss of the level of funding under the current levy would be catastrophic and would reduce the district's funding to less than half the

---

[10]During oral argument, the parties identified a number of State programs that are being developed that will be available to the KCMSD, but these programs have not yet had a significant impact on the district.

-31-

amount that has been available to the KCMSD for a number of years.  Should this loss of funding occur, it would present a changed circumstance that could call for reconsideration of the agreement.

## E.

The Jenkins Class argues that the State cannot be dismissed because it is both a constitutional violator and a defendant subject to joint and several liability.  The district court has concluded that the State's liability as constitutional violator will be satisfied by the payments called for in the settlement.  It has amended the remedy with regard to joint and several liability.[11]  Although the agreement contemplates the dismissal of the State in the future, the KCMSD will nevertheless remain subject to court supervision as a constitutional violator liable to the constitutional victims.  The KCMSD has not sought a declaration of unitary status with respect to any part of its operations.  The effect of the agreement is that the KCMSD now bears sole responsibility for implementing the desegregation remedy and obtaining the funding necessary to do so.

---

[11]We have considered, and now reject, the Jenkins Class's other arguments in opposition to the agreement.  The Class analogizes the agreement to a contract and contends that it cannot be bound by a contract to which it is not a party.  Regardless of the agreement, the district court's order is not akin to a contract.  The Class presented its objections to the district court, those objections were overruled, and the Class is now bound by that order to the same extent as any other court order in this case.

The Class also argues that the district court erred in approving the agreement because: (1) the court was not presented with a justiciable controversy; (2) the order is invalid as an advisory opinion; and (3) the agreement cannot be viewed as an alternative remedy plan because the State did not seek declaratory relief.  These arguments must fail based on our holding that the court's approval of the agreement was an exercise of its continuing equitable authority to devise and implement a remedy in this case.

-32-

In the district court's order approving the settlement, the court expressed concerns about the KCMSD's management, including its top-heavy administration. 959 F. Supp. at 1175-77. The court acknowledged that the KCMSD has made significant progress in the face of substantial obstacles, not the least of which has been the ever-shifting leadership in the KCMSD administration. Id. at 1173. There have been ten district superintendents in the last nine years. Id. The district court made plain that it was simply making observations, and not findings of fact, and that its observations played no role in its decision to approve the agreement. We find instructive, however, the court's identification of areas in which the district's performance has been "dismal at best." Id. These include: (1) the KCMSD still lacks a comprehensive integrated educational and instructional plan; (2) the KCMSD's fragmented efforts to implement meaningful staff development measures have fallen far short of the mark; (3) ongoing administrative instability has plagued the KCMSD for years, resulting in a lack of accountability for deficiencies; (4) the KCMSD still lacks a security plan; and (5) the KCMSD is unable to produce a budget for a particular fiscal year and reconcile it with actual expenditures for specific line items. Id. at 1173-74.

The district judge making these observations, Judge Russell Clark, has presided over this litigation from its inception in 1977 until his decision to withdraw following issuance of the order which we now review. In that twenty-year period, this case was consistently before the court, and Judge Clark's extensive knowledge of conditions in the district has come the hard way, through numerous hearings. His observations point to the nature of the problems facing the district and sharply contrast with the type of operation described by Dr. Murphy in his testimony. Needless to say, these problems are substantial obstacles to the KCMSD's satisfying its obligation to provide quality education. These obstacles are a challenge to the KCMSD's management, and also impose a heavy duty on the district court to closely supervise and monitor the KCMSD management. Thus, in entering into this agreement, the KCMSD may well have brought upon itself a circumstance that will subject it to more, rather than less, judicial

supervision, particularly during the transition period of the next three to four years, and until the vestiges of segregation have been eliminated to the extent practicable.

The district court stated that the KCMSD's administration was not up to the task of eliminating the remaining vestiges within the short time required by the court. It expressed the view that a strong hand with educational expertise and no "vested interest" was essential to accomplish the difficult goals in this transitory period. Id. at 1178. We have referred to the refusal of the court's request that Dr. Bartman and DESE play a role in this respect. The district court stated that in this event it would consider appointment of a special master to oversee the KCMSD and urged that time was of the essence. We are in full agreement that on remand the district court should promptly consider the issue of appropriate supervision over the district. The deficiencies outlined by the district court which we have discussed above and achievement of the goal of attaining unitary status are difficult and complex. We agree with the district court that this is attainable, but it will require skillful and complex administrative and management effort. We leave to the discretion of the district court how best to exercise its oversight. Time is short, and the district court must do what is necessary to assure that the goals are achieved.

We affirm in all respects the district court's statements concerning the transition leading to return of the district to local control. The goal is to eliminate, to the extent practicable, the vestiges of discrimination in this school district, and the district court should spare no effort in ensuring that this goal is reached.

Many aspects of the agreement and its effects are troublesome, and we remain deeply concerned about the future of the KCMSD. The issue of whether the district court erred in approving the agreement is a close one. Nevertheless, we cannot say that the district court clearly erred in its factual findings regarding the agreement, nor that it abused its discretion in approving the agreement and, in effect, modifying the earlier remedy ordered by the court.

We thus affirm the judgment of the district court.

A true copy.

      Attest:

             CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.